10 440
46 990
10 440
50 1229
10 440
115 610

CONNOR'S WIDOW v. ADMINISTRATORS AND HEIRS OF CONNOR.

A marriage was solemnized in Mississippi between a resident of that State and a minor resident of Louisiana, the tutor not objecting thereto, and Mississippi being the matrimonial domicil and so contemplated by the parties at the time of the marriage. *Held*, That although it was the intention of the parties to be married in Louisiana, which was prevented solely by accident, yet the marriage was not constructively and *de jure* a marriage in Louisiana, and after the death of the husband, the widow was not entitled to any portion of the estate in Louisiana as community property under the Code of 1808, which was in force at the time of the marriage.

That certain monies belonging to the wife in Louisiana and received by the husband and invested by him in property in Mississippi, did not constitute her paraphenal funds for which the husband was liable, but became the absolute property of the husband *jure mariti*, under the laws of Mississippi, that being the matrimonial domicil.

That the widow having brought no dowry and being left in comparatively necessitous circumstances is entitled to her *marital portion* in the real estate of Louisiana.

The discrimination which the Codes of 1808 and 1825 make between the rights of wives domiciliated in Louisiana, and those domiciliated in other States on the subject of community is not unconstitutional.

C. C. 2329.

APPEAL from the District Court of Tensas, *Snyder*, J.
*Farrar* and *Henderson*, for plaintiff:

The petitioner, a citizen of the United States, and widow of *Henry L. Connor*, deceased, of the State of Mississippi, sues for *community* in "Arcole Plantation," an estate in parish of Tensas, of the succession of said *H. L. Conner*, deceased.

Her first ground for this claim is,—that her case falls within the laws and decisions of the State of Louisiana, which fix and confer the right, for these reasons:

1st. She was a citizen ward of the State of Louisiana when married.

2d. She was married during the continuance of the Code of 1808.

3d. She was constructively and *de jure* married in Louisiana.

4th. It was the ante-nuptial intention of the spouses, to have made Louisiana their residence.

5th. Mere accident, and the post-nuptial purpose of her husband, made Mississippi their actual residence, but to which act, petitioner, then a minor, and without disposing will, could give no assent.

All these facts are set forth in the petition, and most abundantly sustained in the proof; and on these predicates we invoke the following principles of Louisiana authority:

1st. This was a marriage of a Louisiana ward, and to all legal intents was a Louisiana marriage. And both codes are express that as to such marriage, property acquired in Louisiana is subject to community. O. C. p. 336, Art. 63, p. 324, Art. 10; C. C. Art. 2369; Stor. Com. L., p. 292, note 3. This rule is fully recognised in *McGill's* case, 6 An. 344–5, and 6 An. 257.

2d. At the time of the marriage, it is in clear proof, and without contradiction, that Louisiana was the contemplated domicil of the spouses after marriage, and this, as to marriages out of Louisiana, with but partial and occasional residence in Louisiana is held sufficient to subject the martial rights to Louisiana law.

*Routh's case*, 9 Rob. 224; *Fisher's case*, 2 An. 775; and in *Walker* v. *Duverace*, extended to slaves never in Louisiana, 4, An. 569.

To same effect is *Rowley* v. *Rowley*, 19 Louisiana, 573–578.

When the marriage was in Louisiana, and the property in Louisiana, and domicil intended to have been in Louisiana, no such case has been decided denying the widow community. When superinduced by the marriage, it has never been disallowed for any cause.

3d. This marriage was contracted under the O. C., and Spanish law, and these did not require domicil to give community. 1 Partidas, 532, Tit. 11, Law 24. *Saul* v. *his creditors*, 5, N. S. 577, 580, 586, 589, 595. *Cole's wife* v. *his Heirs*, 44–47 (43 and 51). *Dixon* v. *Dixon's Executor*, 4. La. 190.

4th. The rights of community attached, by virtue of the laws in force at the time and place of marriage. And this rule is a forced sequent from the language of both Codes. That every marriage in this State superinduces of right community of gains. That is, the fact of marriage in the State begets the right, and it thereupon attaches to all property acquisitions in this State as a consequence.

It follows, therefore, that no repeal of the law so then in force, could divest or abate the right. O. C. p. 336, Art. 63; p. 324, Art. 10; 4 La. 191, 192, 193; 9 La. 145; 4 Mart. 648; 9 La. 583–4; 5 An. 144.

5th. It is well known that community in the civil law, is the substitute for dower and distribution of the common law. The laws of all nations make pro·vision for widows, from succession of estates within their jurisdiction. This law, or provision, by whatever name, is a real statute when applied to immovables.

Story's Con. of Law, 3d Ed. p. 278, note 1.

The common law rule is plainly to this effect. Stor. C. L. §454, and see also §461. Wheat's International Law 127, 128.

It was well and clearly decided under the old code that the statute regulating the rights of husband and wife was a real, and not a personal statute. Hence said the court:

"It follows then, as a consequence, that property within the limits of this State must, on the dissolution of the marriage, be distributed according to the laws of Louisiana, no matter where the parties reside; because viewing the statute as real, it is the thing on which it operates that gives it application, not the residence of the person who may profit by the rule it contains."

*Cole's wife,* 7 N. S. 44 (id. p. 47.) To same effect, *Saul* v. *His Creditors,* 5 N. S. and *Dixon* v. *Dixon,* 4 La. 190; 1st Partidas, p. 532, Tit. 11; L. 24. This reasoning we maintain, has a force of logic, that ever has, and ever will resist all assault. Grant the proposition that the law of community is a real statute, and the consequence deduced in Cole's case is an inevitable result.

In fact, the definition of a real statute may be rendered, a law which exerts its force independent of the personal incidents of parties, to be affected by it. 3 An. 426.

But in *Packwood's case,* and long since the C. C., the court, with much display of learning, affirm the doctrine that the law of community is a real statute. 9 Rob. 443.

By what new logic, then, can it be maintained, that by inference and deduction, and not the language of the new code, that a prominent object and result of this real statute is to discriminate between the residence of persons who claim its benefits?

The new code has said, (which the old code omitted to say)—"A marriage contracted out of the State, between persons who afterwards come here to live, is also subjected to the community of acquets and gains, with respect to such property as is acquired after their arrival." Art. 2370.

Now this, we contend, is but a declaration of what the law in like case was before, and as the courts so before decided. But the courts since have seized on the negative pregnant in this article, and decided that if the parties don't remove to Louisiana, the wife has no community rights. Just as well decide that in property acquired in Louisiana before the removal of the spouses there, the husband also should have no heritable rights, but the same should escheat to the State.

We, however, respectfully forbear to press any new views upon the construction of Art. 2370 of the new code. We hope and prefer, to convince the court that our rights are established and maintainable under the old code, without interfering with the court's construction of this article and its accessories of the code of 1825. And because, too, we consider our case exempted from the operation of this article of the code of 1825, for reason that ours was a Louisiana marriage—with the intention of a Louisiana domicil.

But should the court overrule us in all our pretensions of right, as before shown, and consider our case within the *ostracism* of this article, and that this article has been heretofore rightly construed, then we say the article is in manifest conflict with sec. 2, art. 4, C. U. S.

"The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States."

Privileges are rights; immunities are exemptions: the first are direct and positive; the second more negative in character. These privileges, we consider, are necessarily and exactly civil privileges, and are clearly distinguished from *franchise*, *powers*, and *authorities*. All such are *political rights*, and not included in this common grant and concession of civil privileges, secured to all the citizens of the United States, in each and all of the several States.

This grant is said to have its predicate on another power in the C. U. S., that of naturalization. The two most obviously deprive the several States of all authority to make laws of alienage against the citizens of any one of the United States.

Now, the usual and most common privation of alienage is incapacity to take, hold, inherit, and transmit property. This article of the code is a direct penalty of alienage, applied to a citizen of a State of the Union.

Our position is, that a Mississippi wife, widow, or heir, in regard to real property in Louisiana, is entitled by constitutional " privilege " to the same rights of a Louisiana wife, widow, or heir, in like relation to the same property.

Is not this proposition clear of all doubt?  And so universally in conformity to the common understanding, that this article of the code, perhaps, stands alone, in the legislation of the States, in its alienage policy of exclusion. Even Louisiana has no such exclusion against a non-resident heir, and without a show of reason for the discrimiaation, accords to a non-resident widow what in Louisiana jurisprudence is denominated the *marital portion*.   O. C., p. 334, art. 55 ; C. C. art. 2359 ; 5 Ann. 159, 160.  3 N. S., 1, 2.

From all prejudice under this disparaging exception of the code of 1825, we claim protection under this higher law.

Mr. Hamilton, in the Federalist, No. 80, p. 321, considers this section " the basis of Union," and attaches much importance that it is reserved to the federal judiciary, " to secure the full effect of so fundamental a provision, against all evasion and subterfuge."

In No. 42, pp. 170, 171, Mr. Madison much commends the objects of this provision in connexion with the naturalization power.

Justice Story, in his Commentaries on the Constitution of the United States, adverts to the defects of this power in the articles of confederation, as well from the imperfect language used to express it, as that it was dangerous and impractical; because the power of naturalization remained with the States.  He regards the section as a clear inhibitory clause against the power of the States, on the subject of alienage, and especially as affecting the rights of citizens of the United States to "hold real estate, or have other privileges, except as aliens."  And says: " The intention of this clause was to confer on them, if one may so say, a general citizenship, and to communicate all the privileges and immunities which the citizens of the same State would be entitled to under the same circumstances."  Vol. 3, secs. 1800 and 1799.

I do not find a direct judicial decision by the Supreme Court of the United States on this clause.  In *Bank of Augusta* v. *Earle*, 13 Pet. 552, 553, Mr. Webster, *arguendo*, gave the same interpretation to this clause which we seek for it here ; and to the assertion of such rights said, "it is evidently not in the power of any State to impose any hindrance or embarrassment."  His point was, " that citizens of other States may trade in Alabama in whatsoever is lawful to citizens of Alabama."

This court, by its Chief Justice, rightly decided in that case, the rule invoked did not apply, because it was a foreign corporation, instead of citizens, who sought the privilege.

In *Groves* v. *Slaughter*, 15 Pet. R., 515, Judge Baldwin held that it was competent for a State to regulate its *internal commerce in slaves*.  But whatever privilege it gave to its own citizens in this traffic, *enured of right* to all the citizens of the United States under this section.

The allusion to this clause by the Chief Justice, in the case of *Priggs* v. *Commonwealth of Pennsylvania*, 16 Pet. p. 629, I understand as approving our construction.  A like allusion of the Chief Justice is found in the License cases, 5 How. 585.

The Congress of the United States, by its resolution of 2d March, 1821, (6 Stat. at Large, 590,) expunged from the Constitution of the State of Missouri, a clause which was considered as reserving to the State, the power to contravene that section of the Constitution of the United States.  Yet Louisiana, by its new code, Art. 2370, and its judicial construction, has exerted the same power

against non-resident wives, as if she was under no restraint by this section of the Constitution of the United States, and had the right to regard as aliens the citizens of the United States. If she can so legislate against a non-resident wife, she may also against a non-resident husband or heir, and may, of course, discriminate among States in her penalties of alienage, and confer the favor of citizen privileges as may suit her caprice.

There is no intention of reflecting upon the policy of Louisiana on this subject. So far as noted, it is, perhaps, an isolated case of such legislation; and as we believe rightly, fairly, and liberally construed, it is not the necessary interpretation of her law. The new code is wholly silent as to what are the rights of a non-resident wife. The old code was equally so. But the courts, by construction of the old code and the Spanish laws, determined her rights were the same as a resident wife. They adjudged (as the court adjudges since the code of 1825,) that the law of community is a *real statute*. If this be so, it legally and legitimately follows, that its construction is wholly irrespective of the domicil of the parties.

And it may be noted too, that while the courts' decisions for years past, have marked community rights with a rather restrictive policy, the Legislature, by the Act of 1844, considerably extended those rights.

And this judicial policy was scarcely enunciated from the bench, in the case of *Huff* v. *Borland*, 6 An. 437, when the Legislature repudiated the entire alienage principle, by the Act of 18th March, 1852. It is not pretended the Legislature pointed its action in rebuke of the court; but we refer to these acts as grounds for suggestion, that the laws we invoke, *liberally construed*, fully sustain our right of action in this case; and that such liberal interpretation should be indulged, as best comporting with the legislative will on the same subject. The Act last referred to, is as follows :

"No. 292.—An Act relative to the property of non-resident persons in this State.

"Be it enacted, &c., That all property hereafter acquired in this State, by non-resident married persons, whether the title thereto be in the name of either the husband or wife, or in their joint names, shall be subject to the same provision of law which now regulates the community of acquets and gains between citizens of this State. Approved March 18th, 1852."

This law corrects the evil for the future; but we earnestly entreat this court to protect us from this unauthorized penalty which is supposed to have been incurred by us in the past.

The judicial construction of this Article 2370, has never been considered in Louisiana with any reference to the clause in the Constitution of the United States before referred to. But the affirmative disqualification against the non-resident wife is deduced from the negative pregnant of this article. And, in doing so, the law of community is by implication adjudged a personal statute ; whereas all the decisions on the direct point adjudges it a real statute. The construction, therefore, is not necessarily required by the language of the article ; is vastly restrictive, and we believe, erroneous. But it is so adhered to. See succession of *McGill*, 6th An. 314. If, therefore, the code of 1825, is to have any bearing in this case on this point, then we confront such interpretation of this article with the Constitution of the United States, and ask for a judicial conformation of the article to this superior authority.

But if the court shall be of opinion that the construction of Art. 2370 of the new Code precludes our right of recovery, and shall entertain the further opinion that the Constitution of the United States, as referred to by us, does not require this court to remit the plaintiff to the same right in this case, as if a widow of this State ; then we respectfully solicit the honorable court so to pronounce its opinion, that we may, if deemed necessary, review its judgment in the Supreme Court of the United States.

The plaintiff is also entitled to recover the amount of her paraphernal property received by her husband in the State of Louisiana, after her marriage.

Paid *H. L. C.*, by Judge *Porter*, plaintiff's guardian, $4,452 24.

Judge *Baker's* deposition, paid *H. L. C.*, for plaintiff's lands, $1,600.

Dr. *Metcalf's* deposition, value of lot-horses, $250.—Total $6,302 24.

Deposition of Mrs. *Ker*, proves amount about $7,000.

This right adjudged in principle, in the case of *Arnold* v. *McBride*, 6 An. 703. To same effect, *Pulliam* v. *Pulliam*, From. Ch. R. 354. 7 La. 194. 10 La. 260.

CONNOR
v.
CONNOR.

To the case so made and proven, the defendants plead generally and special-ly: First, a general denial except as admitted, and then specially set forth the alleged facts of the marriage succession and inheritance, and all the proceedings had in administration of the estate; and especially the proceedings had to effect partition, and this judgment of partition is plead in bar *res judicata.*

But the defence does not set up the acts of plaintiff or her attorneys as rati-fication or judicial admission of defendant's pretensions.

The *res judicata* is not well plead and cannot avail. Neither the parties, or matters in issue, in the partition were the same as in this case.

1st. This suit is by the mother in her personal right and against all her chil-dren, her wards included.

That was by part of her children against her as tutrix for the minors.

2. To this suit *Elliot* and *Marshall* are defendants, but were not parties in that.

3d. The suit for partition involved no rights of third parties, claiming adverse to the alleged inheritance. And the plaintiff's claim in this suit could only have been presented in that, by a third opposition, which she was not bound to interpose.

4th. Subject matter in controversy was in no wise similar; much less iden-tical.

5th. The judgment plead was not, and is not final. Its appeal was perfected 22d of April, 1853, and seven months before one of defendants (*Marshall*) plead it *res judicata.*

We consider, therefore, there is no plausible foundation for this plea.

As to the facts supposed to be admitted in the record by the plaintiff, ad-verse to her title, as asserted in this suit, and tending to establish and sustain the title of defendants, even if these were relied on in the defence as judi-cial admissions, or ratification, they could avail defendants nothing. These supposed admissions are contained in two petitions, filed by counsel in plain-tiff's name as tutrix, the one filed on the 3d of September, 1851, the other on the 15th of March, 1852.

On the first, no order or procedure of any kind appears to have been taken. And being in no sense a judicial proceeding, its averments could not be assumed as judicial admissions.

The other petition professes to express her desire as tutrix, to promote the partition sought for by Mrs. *Brickle,* but was powerless to act for her minor wards, and therefore prayed a family meeting. Such family meeting was there-upon ordered, but its deliberations are not shown in the record, if any were had.

But if these petitions declare or admit anything adverse to the rights sued for in this case, they were only by attorneys at law, and not attorneys in fact. C. C. Art. 2270, and are met by the oath of the plaintiff, that they were unau-thorized. And the record shows her prompt change of counsel, and her plea of the 9th of October, 1852, denying and resisting all grounds of partition.

*Shaw* and *E. A. Bradford,* for defendants:

The plaintiff alleges, that the property which is the subject of this suit, hav-ing been purchased by her husband during the marriage, belonged to the com-munity which she pretends existed between them, and that consequently, up-on the dissolution of the community by the decease of *H. L. Connor,* her hus-band, the one-half of that property became absolutely hers; that, by reason of the intestacy of the deceased husband, the plaintiff as widow in community, is entitled to the usufruct of the other half of said property; that certain slaves, bought after the decease of *H. L. Connor* and paid for out of the rev-enues of the Louisiana property, belong to her; that she has inherited from her deceased daughter *Anna,* one-fourth of her distributive share as heir of said *H. L. Connor ;* that the succession of *H. L. Connor* is indebted to her in about the sum of $7,000, for her paraphernal property; that she is entitled to claim commissions as tutrix to the heirs of *H. L. Connor ;* and that she is enti-tled to claim the *marital portion* because of her being left in necessitous cir-cumstances.

In a supplementary petition, she sets up that a public sale of the property had been made under a decree of partition; and that by reason of a private sale of their shares, made by three of the heirs, and the public sale having been made at the courthouse of the parish and not on the plantation, the property was sacrificed; the purchaser was made a party, and she prays to annul the sale and recover the property, &c.

The answers deny every proposition of the plaintiff except her claim to the inheritance from her deceased daughter.

On behalf of the defence, we propose now to consider the pretensions of the plaintiff in the following order:

1st. As to the existence of the pretended community.

The evidence of the plaintiff's own statements show clearly, that *Henry L. Connor* previously to, at the time of, and subsequently to his marriage with plaintiff, was a resident of the State of Mississippi; that the marriage was celebrated at the house of her sister in that State, and that they continued to reside in that State up to the time of the husband's decease. That immediately after his marriage the husband went on to establish his home and enlarge his property in Mississippi.

Under this state of facts, we contend that the community did not exist, and that the property purchased in Louisiana by *H. L. Connor* was his separate property, and as such upon his decease intestate, descended to his heirs. We refer to Louisiana Code, Art. 2370, and to a few decisions of this Court in support of our position.   9 Rob. 443; 2 An. 257, 344, 436.

Much stress seems to be laid on an alleged intention to make the matrimonial domicil in the State of Louisiana. · But whatever may have been the idle talk on this subject, there is not shown any act of Mr. *Connor* indicating any such intention; but all his acts show the contrary. But, were it otherwise, intention without actual performance will not avail in the change and establishment of domicil.   The] parties must have actually removed to and established their residence in this State in order to create the community, which, even then, would only regulate property, subsequently acquired.  9 Rob. 224; 2 An. 775; 4 An. 469.

As to the incapacity of the plaintiff to give a valid consent to the marriage, it is not desired to say anything about it; it is supposed that she was legally married and must abide all its consequence.

As to the argument professed to be based on the 2d Sec. 4th Art. of the U. S. Constitution, we contend that it has no application to the question now under consideration, and do not consider that the provision quoted, in any manner interferes with the provisions of the Article of the Code and the uniform construction of it by this Court.   We contend therefore that the plaintiff's pretension in this respect must be rejected.

2nd and 3d.   With the fall of the community, must also fall the claim for usufruct of the other half of the property, and to slaves bought after the decease of *H. L. Connor*.

4th. As to plaintiff's inheritance from her deceased daughter, *Anna;* the defendants are not in possession of it, nor have they been so; nor do they prefer any claim to it; nor have they ever denied or interferred with plaintiff's claim to it, and we cannot see, therefore, what right she has to demand it of defendants.

5th. As to plaintiff's claim on the succession of her husband for her so called paraphernal rights.

She alleges, that her husband, during the marriage, received certain moneys belonging to her in Louisiana, and that he invested them in property in Mississippi, which was his separate property.   The matrimonial domicil was in the State of Mississippi, which is undisputed, the Common Law prevails in that State, and by that Law the personal effects of the wife, upon being reduced into possession by the husband, become his absolutely.   Personal property is governed by the laws of the domicil of the owner and without regard to its actual location.   This money therefore when received by the husband, became his property, absolutely "*jure mariti,*" and consequently the wife has no claim on the succession here for it.   2 An. 980.

6th. As to the claim for commissions as tutrix; she has not rendered any account of her tutorship, and has not shown that she administered any property of her wards, and certainly not how much, so that such allowance could be made; she surely cannot be entitled to commissions, at least as yet.

7th. As to the claim for the marital portion.

The deceased *H. L. Conner*, husband of the plaintiff, left an estate in Louisiana, appraised at $58,456 75c. and five heirs, daughters of himself and plaintiff.

The plaintiff herself shows, that for her dower she was assigned a life estate in 376 acres of land in the state of Mississippi; and slaves and personal effects,

in fee, to the amount of $10,163 38, Record, p. 114. Also that she was supported at the expense of the estate during the year of mourning. Deeds to be found, pp. 184 to 188, &c. show that, soon after the death of her husband, the plaintiff gave $3,000 cash for one piece of property, $15,000 for another piece and $3,200 on a credit for more. In her supplemental petition, p. 20, she says that from her own means she furnished a part or all of the support of her minor children, and partially the supplies of the plantation in Tensas parish.

The deceased, Mr. *Connor*, was a man of fortune, but not very large, he lived as a prudent and liberal country gentlemen, by no means extravagant, he had five daughters, several of them of marriageable age, previous to his decease, and the style of living he was accustomed to under these circumstances would be necessarily more expensive than would be that of his widow. She could live in the same comfort and style on a much less income, as she had not to support her children; their expenses were properly chargeable to, and to be paid out of their own means. The plaintiff had nobody to support but herself. She says that she supported her minor children, and partially supplied the plantation in Louisiana. Can she then be considered to have been in necessitous circumstances, as an American Republican Widow !

We contend therefore, that she shows no claim whatever to the *marital portion.*

And last, as to the matter set up in the supplemental petition; we contend that any heir or co-proprietor, being legally capable of acting for himself, has the right to sell his inheritance or share in the undivided property, at private sale, if he choose, and the co-heirs or co-proprietors have no right to object to it. Besides, this private agreement made, the property brings more than it would have done without it, and although it resulted a little unfortunately to the private vendors, it resulted very much to the advantage of their co-proprietors, by an increase of the price of the property to at least $20,000.

SLIDELL, C. J. In the settlement of the estate of the deceased, *H. L. Connor*, a controversy has arisen between his widow and his children. It is one of those family disputes with which our judicial annals so painfully abound, and which seem a necessary and unamiable consequence of our peculiar laws on the subject of the conjugal relations and of inheritance. In the perusal of this voluminous record the suggestion constantly recurs to the disinterested mind how much better it would have been if these parties had arranged their conflicting pretensions in a spirit of filial and parental affection. As they have chosen to pursue a different course, we are to apply the rules of law in the distribution of the estate.

Mr. *Connor* was a native and resident of Mississippi. He lived and died in that State. In 1824 he became affianced to the plaintiff, *Susan E. Baker*, a minor, residing in Louisiana, and under the guardianship of her tutor, *Alexander Porter*, a resident of Louisiana. After completing her education at the North, she was placed on her return to Louisiana in the family and under the care of her sister, Mrs. *Ker*, a resident of the parish of Concordia, in this State. The consent of her tutor was given in these words:

"I, *Alexander Porter, jr.*, of the city of New Orleans, duly appointed tutor by the Court of Probates in the parish of St. Mary, Attakapas, in the State of Louisiana, to *Susan Baker*, minor, daughter of the late *Joshua Baker*, deceased, do in my quality aforesaid, by these presents, consent that the rites of matrimony be solemnized between *Henry L. Connor*, of Adams county, in the State of Mississippi, and the said *Susan Baker;* and I sign these presents, and affix my seal thereto, in the city of New Orleans, this 4th day of May, 1824, in order that the same may serve in time and place.

[L. S.]                          ALEXANDER PORTER, JR."

It was intended that the marriage should be solemnized at the house of Mrs. *Ker,* but in consequence of the overflow of the Mississippi at the time, it was found inconvenient for their Mississippi friends and the Mississippi magistrate,

Judge *Winston*, to reach Mrs. *Ker's* house in Concordia, and the place of solemnization was changed to the house of another sister in Mississippi. Immediately after the marriage in May, 1824, they went to live at Oak Hill, in Adams county, Mississippi, the residence of Mr. *Connor's* mother. Here they continued to live until Mr. *Connor's* landed estate in that county, owned at the time of his marriage, was increased by the acquisition of lands there, inherited by his brother. He erected upon this estate a commodious dwelling, embelished it with an extensive garden and ornamental grounds, and lived, until his death, at this seat, which he called Berkley, in a style of comfort and elegance. The slaves and other personalty of his Mississippi estate amounted at his death to about $61,000, and Berkley was a tract of about 1200 acres.

In 1841 he purchased a valuable plantation in the parish of Concordia, which was kept in successful cultivation until his death, and was then inventoried, with its slaves, etc., at $58,456 75. A very comfortable dwelling-house was built upon this plantation, and occasionally the husband and wife visited the place, and tarried for some time upon such visits, Berkley, however, always remaining their home, and Mississippi their domicil. There is evidence that he occasionally spoke, after his marriage, of an idea of going to Louisiana to live. One witness not only says she had often heard him speak about going to Louisiana to live, but that he contemplated at the time of his marriage à removal to the State of Louisiana. But upon a fair review of all the testimony upon this subject in connection with the surrounding circumstances, and especially the continuous and consistent acts of the parties, which speak more forcibly than casual words, we are satisfied that there was not in the mind of *Connor*, at the time of the marriage, or subsequently, a settled purpose to live in Louisiana, much less any antenuptial understanding that such should be the case, and it is certain that his vague views as to a change of domicil never even approached a realization. Mississippi must unquestionably be considered not only the matrimonial domicil, but the matrimonial domicil contemplated at the time of the marriage.

It further appears that after the marriage, and after Mrs. *Connor* had taken up her abode in Mississippi, the husband and wife received from Judge *Porter* $4452 24, being the amount of her patrimony in her tutor's hands, which sum the husband converted to his own use. The wife has participated in the distribution of the Mississippi estate, and occupies the Berkley mansion under the assignment of dower, but with means incompetent to sustain the establishment in its former style, or to live otherwise in the comfort and luxury to which she was habituated before widowhood.

I. The most important inquiry in this cause is whether the claim by the wife of one-half of the Louisiana estate, as widow in community, is well founded.

The proposition is advanced upon the ground that, by the Code of 1808, which was in force at the time of entering into wedlock, every marriage contracted in the territory of Louisiana superinduced of right, partnership or community of acquets or gains, such being the express provision of article 3 of section 4 of that Code; that although in this case the marriage was actually celebrated in Mississippi, she was a Louisiana ward, and was constructively and *de jure* married in Louisiana; that it was the ante-nuptial intention of the spouses to make Louisiana their residence, and mere accident, and the post-nuptial purpose of her husband, made Mississippi their actual residence; but to which act petitioner, then a minor, and without disposing will, could give no assent. These grounds, it is argued, are set forth in the petition and sustained by the evidence.

In these views of the law and facts we do not concur.

It is true that an accident changed the mere place of solemnization from Louisiana to Mississippi. But that this change was made against the wish of the tutor does not appear, and cannot reasonably be inferred. It is impossible to infer from the evidence in the cause that the house of Mrs. *Ker*, in Concordia, was originally selected, or the house of Mrs. *Metcalf*, in Mississippi, subsequently adopted as the place of marriage, with reference to any question of property or marital right. The choice in both cases seems to have been suggested by mere considerations of convenience and decorum. The language of the tutor's consent indicates no restrictions to Louisiana as the place of celebration, and does contain matter suggestive of the inference that no such restriction was intended. Under the then existing laws and jurisprudence of the State of Louisiana, this marriage would have been considered a Mississippi marriage, even if an accident had not prevented its solemnization in Louisiana. In *Ford's* case, decided while the Code of 1808 and the Spanish laws were still in force, the question was whether the slaves of the wife, who was married in Mississippi, passed to her husband by the laws of that State, or remained her paraphernal property by virtue of the law of Louisiana, which, was contemplated at the time as the matrimonial domicil, and within a reasonable time became so actually. Martin J., as the organ of the court, solves the question thus:

" We think that it may safely be laid down as a principle that the matrimonial rights of a wife, who, as in the present case, marries with the intention of an instant removal, for residence in another State, are to be regulated by the laws of her intended domicil, when no marriage contract is made, or one without any provision in this respect."

The existence of this jurisprudence certainly loses none of its significance as a fact in this cause, when it is considered that *Alexander Porter*, the tutor, who authorized his ward to marry a gentleman domiciled in Mississippi, was an eminent member of the judiciary of Louisiana, and as such concurred in the opinion in *Ford's* case.

As to the ante-nuptial intention of the parties respecting the matrimonial domicil, there is no reasonable ground to say that Louisiana was contemplated. The weight of evidence, as we have already remarked, is entirely opposed to such a conclusion.

We find no fair analogy as to facts between this case and the case of the minor *Le Breton*; and the doctrine there enunciated clearly militates against the present plaintiff.

*Alexandrine Le Breton*, a minor, thirteen years of age, without the consent of her mother, fled from New Orleans with her lover to Natchez, with the intention, as the Court inferred from the evidence, to be married there and return to New Orleans as soon as it could conveniently be done. They remained a few weeks in a tavern at Natchez, and soon after returned to New Orleans, where they continued to reside until the wife's death. The husband claimed to have become owner of his wife's chattels *jure mariti* under the law of Mississippi ; but his pretensions were rejected, and one of the grounds for the conclusion was that although the marriage took place in Mississippi, Louisiana was the contemplated matrimonial domicil; another was that the carrying the minor out of the State, without the consent of the mother, was in *fraudem legis*, and a marriage contracted under such circumstances in another State did not defeat the action of the law of Louisiana on the wife's property received by the husband here.

The Spanish laws do not enter into the consideration of the case, having been abrogated before the acquisition of the Louisiana estate; and the claim of the wife derives no support from the Code of 1825. It declares that every marriage contracted in this State superinduces, of right, partnership or community of acquets and gains, if there be no stipulation to the contrary. A marriage contracted out of this State, between persons who afterwards come here to live, is also subjected to the community of acquets, with respect to such property as is acquired after their arrival. Articles 2369, 2370. The present marriage was not contracted in this State nor in contemplation of a matrimonial domicil in this State, nor did the parties or either of them come here to live before the acquisition of the Louisiana property.

Under the well settled interpretation of the Code of 1825, applied to the facts of this case, Mrs. *Connor* was not a partner in community. *Succession of Packwood*, 4 Rob. 438. *Huff* v. *Bolard*, 6 Ann. 437. *Succession of Franklin*, 7 Ann. 395. We speak now of a case arising before the Act of 1852, by which Act the legislature, dissatisfied with the existing law, extended the community of acquets and gains in favor of non-resident married persons to property in this State thereafter acquired, p. 200.

Lastly, the plaintiff insists she is protected by Section 2, of Article 4th of the Constitution of the United States, which ordains that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States." The plaintiff's position, as defined by the counsel in his written argument, is "that a Mississippi wife, widow or heir, in regard to real property in Louisiana is entitled by constitutional privilege to the same rights as a Louisiana wife, widow or heir, in like relation to the same property." Limiting our answer to so much of the proposition, as pertains to the question of community, we are of opinion that the provisions of the Code of 1808 and 1825 on the subject of community do not conflict with the Constitution of the United States. They say, to all who chose to marry in this State, be they citizens of this State or of other States, your marriage in this State shall superinduce, of right, a partnership or community of acquets or gains, if you make no stipulation to the contrary, when you make the contract of marriage in this State, the law in your silence implies the partnership as an incident of your contract. So again the law says to all persons married elsewhere, be they citizens of Louisiana or citizens of other States, if you choose, after marriage to come to Louisiana to live, your acquisitions in Louisiana (at least in the absence of your previous marriage agreement to the contrary,) will be deemed as made subject to the community of acquets. In neither case do we discover an unconstitutional discrimination between our own citizens and citizens of other States of the Union.

II. With the failure of the claim of community, the claim of usufruct of the Louisiana property after the husband's death also fails.

III. The claim of $6952 24–100; amount of alleged paraphernal funds received by the husband cannot be sustained. The marriage took place in Mississippi, the husband was then domiciled there, that State became and remained the matrimonial domicil, and there was no clear ante-nuptial nor post-nuptial understanding that the parties should come to Louisiana to reside, the frustration of which might perhaps be regarded as a fraud on the wife.

The law of Mississippi must therefore control the wife's rights.

57

Under that law her personalty, reduced into possession by the husband, became his *jure mariti.* See *Hayden* v. *Nutt,* 4 Ann. 68. *Marcenaro* v. *Butoli,* 2 Ann. 980.

IV. The plaintiff claims the marital portion, in case her claims for community and paraphernal rights are disallowed. The doctrine is not disputed that this right to the marital portion in real estate situate in Louisiana results from the marriage, no matter where contracted, and that the wife takes by inheritance. But the claim is opposed on the ground that Mrs. *Connor* was not left in necessitous circumstances.

The Article 2359 of our Code which confers the right is in these words :

"When the wife has not brought any dowry, or when what she has brought as a dowry is inconsiderable with respect to the condition of the husband, if either the husband or the wife die rich, leaving the survivor in necessitous circumstances, the latter has a right to take out of the succession of the deceased what is called the *marital portion,* that is, the fourth of the succession in full property if there be no children, and the same portion in usufruct only, when there are but three or a smaller number of children, and if there be more than three children, the surviving, whether husband or wife, shall receive only a child's share in usufruct, and he is bound to include in this portion what has been left him as a legacy by the husband or wife, who died first."

In the present case the wife brought no dowry, and her little patrimony was, as we have seen, received by her husband, became his *jure mariti,* and was converted to his own use. We have also seen that she is excluded from the community of acquets, and so far as the evidence informs us, although she had a modest patrimony before marriage, she was, as to any. means of her own, penniless at his death ; and her husband having omitted to make provision for her by will, which it seems it was his intention to do on a scale commensurate with his affection and her meritorious conduct, she had nothing for her future support, save what the laws of Mississippi and Louisiana would accord to her. In this view of the case and as to any means of her own, she was unquestionably left at her husband's death in necessitous circumstances.

*Foster* v. *Ferguson,* 1 Ann. 263, was a case analogous in its circumstances, so far as the immediate point before us is involved. The marriage was contracted in Mississippi, and although made with the view of a residence in Louisiana, yet in consequence of the early death of the husband, and his fortune having been acquired before marriage, she seems to have taken nothing as partner in community. Under the laws of Mississippi she had received as dower an usufruct in one half of his real estate, and also in full property one half of the nett personalty, which were not however sufficient for her maintenance. The District Court had awarded the widow one fourth of the estimated value of the deceased estate in Louisiana, deducting the estimated value of her Mississippi dower. The Supreme Court reversed the judgment in this respect, and gave the widow one fourth of the succession of the husband left in this State "independent of the rights which she had acquired in the estate in Mississippi." It is true this is the only decision upon the point cited from our reports, and it is also true that the grounds of the conclusion are not fully elaborated. It is a precedent, however, and as such should be followed, even though solitary, unless we are clearly satisfied that its doctrines are unsound. Of this we are by no means satisfied ; and on the contrary we think it will bear the test of an analysis upon principles of justice and common sense. If instead of being situate in

different countries, the whole of *Foster's* estate had been in Louisiana, it is clear that the marital fourth would have been assigned upon the whole estate. But a part happened to be in Mississippi, and had been subjected to a Mississippi distribution, which assigned to the widow a share which the law of that State deemed equitable and just. By maintaining the marital portion without reduction in the Louisiana estimate, the widow received an equitable share in her husband's whole estate, and no more. By reducing it the spirit of both statutes would have been violated; for the spirit of each was that a provision for the widow's support proportionate to the husband's fortune and condition in life should be made out of his estates.

It was however argued on behalf of the heirs that in ascertaining whether Mrs. *Connor* was in necessitous circumstances, the state of her means at a time subsequent to her husband's death, could be considered, and that by reference to certain deeds of sale made to her about two years after her husband's death, it will be seen that she made large purchases, for which she paid an important portion in cash, a state of things inconsistent with penury. These purchases she made from her children of their interest in the homestead estate and the slaves which, during her husband's life time, had been employed upon it. A portion of this homestead estate had been already set apart to her in dower, which included the family dwelling; and from this consideration, as well as in fulfilment of a wish of the husband repeatedly expressed in conversation, but unfortunately for her, not consecrated by a will, that she should pass the remainder of her days in the enjoyment of the estate where they had spent their married life in comfort and luxury, it was natural she should desire to extend her interest in the homestead; and it may well have been that some of the influential and wealthy friends of her husband and herself, by whom she was surrounded, may have assisted her in raising cash means. But even if these cash means were the result of her industry, thrift or good fortune subsequent to her husband's death (for it seems clear that she had no fortune of her own when he died), we apprehend that subsequent prosperity and easy circumstances are not a test contemplated in our Code. It is true, an authority cited from a French commentator seems to counterbalance the doctrine asserted by the children. Merlin in his Repertoire, verbo Quarto de Conjointe Pauvre, puts the question whether in determining the widow's right, the state of her fortune and the precise time of her husband's death should be considered. He does not seem to announce his own opinion, but says that Dumoulin and Lebrun make a distinction between the case where the wife's change of fortune has followed closely on the death of the husband or has supervened a long time afterwards, and say that in the latter case, things must be left as they are. The language of our Code seems to point very distinctly to the state of things at the date of the death—"if either the husband or the wife die rich, *leaving* the survivor in necessitous circumstances." Moreover the doctrine which looks to the posterior state of things seems out of harmony with the analogies of the Code and a sound legal philosophy. It is not the general policy of the law to leave rights either in abeyance or determination upon future accident. We prefer the intepretation of Gregorio Lopez in commenting upon a kindred provision of the Spanish law. We refer to the 6th Partida, tit. 13, law 7: "Men are sometimes content to marry women who are poor and without a dowry; it is therefore but just and proper, that since they loved and honored them through life, they should not leave them destitute at their death. The ancient

CONNOR
v.
CONNOR.

sages have therefore thought fit to ordain, that if the husband should not leave such wife the means of living well and decorously, and she should not have possessed such means of her own, (nin ella lo ouiesse de lo suyo,) then she may inherit one fourth of his estate, notwithstanding he should have children ; but such fourth part ought not to exceed one hundred pounds in gold, however great may be the estate of the deceased. But if such wife should have possessed (ouiesse de lo suyo) the means of her own of living decorously, then she has no demand on the estate of her husband on account of such fourth part."

Upon this Lopez remarks: Item cum hic chicit nin ella lo ouiesse de lo suyo, intelligitur tempore mortis mariti, quia qualitas adjecta verbo intelligitur secundum tempus verbi. Unde licet postea efficiatur dives, non excludetur ab ista quarta et ejus petitione, ut tenet idem decius in dict. authent. præterea, in fin, reprens se ita con su luisse, et pater ejus consilio 24. In the same note, he justly states that the spirit of the law is not to exclude the wife if by the labor of her own hands she could earn a subsistence, and that the law looks to the condition in life, its comforts and luxuries, which she had enjoyed during marriage. Ista quarta datur in honorem prœtuiti matrimonii, ut conserventur conjuges in solito status.

V. The claim for commissions as natural tutrix cannot be disposed of at present, no account of the tutorship having been yet rendered, and moreover, it not appearing what property she actually administered, &c.

VI. She is entitled to be recognized as inheriting one-fourth of the share of her deceased daughter, *Anna,* in the Louisiana succession.

VII. We do not think the plaintiff has shown any injury sustained by the sale of the property to *George R. Marshall.* There is on the contrary respectable testimony tending to the conclusion that the price of adjudication was enhanced by the private agreement made between the purchaser and a portion of the heirs.

The plea of *res judicata* is not relied upon in the points and brief of the appellees, and we have not therefore discussed it.

It is therefore decreed that the judgment of the District Court be reversed, and it is further decreed :

I. That the plaintiff's claim of community and of usufruct as surviving spouse in alleged community, and for paraphernal rights, be rejected.

II. That the plaintiff's claim for commissions as natural tutrix be reserved.

III. That she be recognized as the heir of her deceased child *Anna F. Connor,* for one fourth of the said child's share in the Louisiana succession of the said *Henry L. Connor,* deceased.

IV. That her claim for the marital portion of the Louisiana succession of her deceased husband, *Henry L. Connor,* to wit the usufruct of one sixth, be and is hereby sustained, the same to be adjusted by future proceedings therein.

V. That the claim to annul the adjudication of the Arcole plantation, slaves and appurtenances to *George R. Marshall,* be rejected.

VI. That the price of sale of the said Arcole Plantation, slaves and appurtenances, at which it was adjudicated to said *Marshall* $135,050, be considered as representing the estate in Louisiana as left by the deceased, subject to a reasonable deduction for the value of the slaves added thereto and improvements made since the death of the said *Henry L. Connor,* and existing at the date of adjudication to said *George R. Marshall.*

VII. That this cause be remanded for the purpose of effecting a final settlement of accounts, a partition and further proceedings according to law, the costs of the appeal to be paid by the defendants.

Re-hearing refused.

---

Note.—This case has been taken to the Supreme Court of the United States by writ of error.