## No. 12,539.

SUCCESSION OF MRS. C. M. ROGGE, BY PREVIOUS MARRIAGE WIDOW OF FRANCOIS AMARE.

WM. ROGGE VS. P. F. NOUVET, EXECUTOR, ET AL.

1. A claim long pending against an alleged debtor, not presented nor prosecuted during her lifetime and only sought to be enforced after her death, is looked upon as stale, not regarded with favor, and the evidence in support thereof must be entirely conclusive and satisfactory.

2. The presumption that property purchased during marriage in the name of the wife pertains to the community may be rebutted by proof of the origin, existence and investment of paraphernal funds administered by her.

3. The spouse dying rich, possessed of wealth which had been the common enjoyment of the conjugal pair, must leave the other in necessitous circumstances to entitle the latter to the marital portion. Long separation of the husband from the wife, under the facts of this case, preclude his recovery.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Théard, J.*

---

*Dart & Kernan* and *Benjamin Rice Forman* for Plaintiff, Appellant.

---

*J. L. Peytavin, W. J. Waguespack, Chas. J. Théard* and *J. Numa Augustin* for Defendants, Appellees.

Argued and submitted February 21, 1898.

Opinion handed down June 13, 1898.

Rehearing refused June 29, 1898.

The opinion of the court was delivered by

BLANCHARD, J. William Rogge and Christina Amare were married in New Orleans in September 1886.

He was a widower and resided in Louisiana; she a widow residing in Mississippi.

He owned some property at the time of the marriage, but was hopelessly involved in debt and subsequently lost everything.

She was well-to-do, in fact rich for one in her station in life.

Her property consisted of real estate, stock, securities and money. It was under her exclusive administration and continued to be after her marriage to Rogge.

She had no children at the time of her last marriage and none as the result of that marriage.

Rogge had two daughters by his first marriage, one of whom was herself married when the father wedded the second time, and the other was well grown.

Mr. and Mrs. Rogge, immediately following their marriage, went to reside at Biloxi, Miss., where the wife had a home in which she had lived for many years. Subsequently the younger daughter of Mr. Rogge by his former marriage was brought to Biloxi by the father to the home of the step-mother.

The marriage was an ill-assorted one. The couple did not get along well together. Disagreements arose and discord developed.

The husband, on one of his trips back to Louisiana, met with an accident from a railway train by which he lost an arm. This, with the increasing embarrassment of his affairs, seems to have intensified the situation.

Matters grew worse in the conjugal home in Mississippi, until after awhile, the husband returned to Louisiana for good.

There was a virtual separation. The parties ceased to live together.

In January 1889, the wife brought suit for divorce, charging cruel treatment, violence and failure to support. This action was filed in the Chancery Court of Harrison County, Mississippi, where she resided. She averred the husband to be a non-resident of Missis-

sippi. He was cited by publication under the Mississippi statute in such cases. In August 1889, he filed an answer to this proceeding, contesting the same and praying for judgment for an annual allowance out of the wife's estate for his support and maintenance, averring his poor circumstances and his incapacity for physical labor on account of the loss of his right arm.

The wife failed in this suit. Her bill was dismissed August 16, 1889, because of failure to establish the allegations thereof. Nothing was allowed the husband.

In June 1892, three years later, the wife brought a second action for divorce in the Chancery Court of Mississippi. She averred her continued residence in Mississippi and her husband's non-residence. The grounds set up were substantially the same as those alleged in the first bill, and, in addition, she charged wilful desertion and assault and battery. The citation was by publication—the wife deposing that her husband was a resident of Louisiana, but that his postoffice address was unknown to her.

The husband did not appear and no answer was filed on his behalf.

In August 1893, more than a year after the filing of the bill, a decree of divorce in favor of the wife was handed down.

In July 1895, Mrs. Rogge died at her home in Mississippi.

Her succession was opened in the Chancery Court of Harrison County, Mississippi, a paper was presented as her last will and testament, it was admitted to probate, and P. F. Nouvet qualified thereunder as testamentary executor, he having been named as such in the will.

This will was dated New Orleans, December 31, 1889, and was executed a few months after her failure to secure the first divorce applied for.

It was signed by her in the presence of two witnesses. It does not purport to be what is known in the Louisiana law, as the olographic will, nor is it in the proper form of the nuncupative will by public or private act as recognized by the law of this State. She, however, averred herself in the will to be a resident of Mississippi, and it was there presented for, and admitted to, probate. Its validity as a will has not been contested either in the courts of Mississippi or in this State, and Mr. Nouvet has been recognized as executor by the courts here.

The will instituted the sisters of the testatrix and the relatives in

France of her deceased husband, Francois Amare, her residuary lega-tees, first bequeathing a few small special legacies to other persons, and leaving to her husband, Wm. Rogge, one dollar.

In March, 1896, this suit was brought by Rogge against the execu-tor and the residuary legatees.

He avers that he is a creditor of the succession of Mrs. Rogge, deceased, in the sum of five thousand dollars for moneys advanced and loaned her, four thousand dollars of it on the 14th of September 1886, a week before his marriage to her, and the other one thousand dollars on or about October 1, 1886, a few days after his marriage.

He asks judgment for this sum.

He next sets forth that the property shown on the inventory of the succession, as opened in Louisiana, is community property, and he asks to be adjudged entitled to one-half thereof, and for partition and settlement of the community.

Lastly, he alleges that he is in necessitous circumstances, that his wife died rich, and that if for any reason he be denied recognition as partner in community, then, in the alternative, he prays to be decreed entitled to the marital fourth of the estate.

The executor and institued heirs file answers alleging that the con-jugal residence of this married couple was established in Mississippi immediately following the marriage, in the home where the wife had previously resided for thirty years; that he was guilty of cruel treat-ment and violence toward her and finally of abandonment; that on these grounds, which are averred to be sufficient under the laws of Mississippi, she recovered a decree of divorce against him after due and legal proceedings; and that thereafter he ceased to be her husband.

They deny that the plaintiff ever loaned any money to the deceased, and deny that any of the assets or property of the succession appear-ing on the inventory belong to the community alleged to have existed between plaintiff and the deceased, and deny that any community ever existed.

They specially represent that all the effects and assets of the estate were the separate, paraphernal property of the deceased, acquired with and by her separate funds always under her sole and exclusive administration.

Plaintiff's petition had referred to the decree of divorce, denounc-ing it as null and void, because of want of citation or legal process, but there had been no prayer for relief as against it.

The parties went to trial on the issues as made up and during the progress of the trial plaintiff presented a supplemental petition in which he set forth that it was *ten* thousand dollars instead of *five* thousand that he had loaned his wife just prior to their marriage— naming the same day, September 14, 1886, as that on which he had let her have the second five thousand dollars. In this petition he elaborated his claims, as surviving spouse, in the community and averred fuller grounds for his contention that the Mississippi decree of divorce was a nullity.

The filing of this amended petition was resisted on the grounds (1) that it came too late; (2) that it changed the substance of the original demand in that it claimed judgment for assets (alleged to belong to the community) which were within the jurisdiction of the court in Mississippi where the *primary* succession had been opened, the mortuary proceedings taken in Louisiana being *ancillary;* and (3) that the court here had no jurisdiction over assets within the jurisdiction of the Mississippi court and under administration there.

These objections to the reception of the supplemental petition were by consent referred to the merits, but not to be considered waived.

Still later, when the trial of the case was drawing to a close, a second supplemental petition was presented. Its purpose was to attack as fraudulent the decree of divorce granted by the Mississippi court. The prayer was for judgment declaring the divorce to have been fraudulently obtained and without force or effect as against the plaintiff herein.

The filing of this amendment was resisted on the ground that it came too late and because it changed the substance of the original issue.

The court refused the filing and plaintiff expected, attaching the paper to his bill.

There was judgment in favor of defendants rejecting in *toto* the demands of plaintiff, and he prosecutes this appeal.

The question of practice raised in regard to whether or not plaintiff could, after the trial begun, amend his pleadings, as was sought to be done by the presentation of his first amended petition claiming ten thousand instead of five thousand dollars, need not be passed upon.

The evidence entirely fails to convince us that plaintiff at any time

loaned Mrs. Amare, his intended wife, either five thousand dollars as first claimed, or ten thousand dollars, as subsequently claimed, or any other sum of money.

If it were ten thousand dollars he had loaned her on September 14, 1886, as he, later, averred, it is not easy to understand how he or his counsel could have made the mistake of setting forth in their first petition it was only one-half of that sum he had advanced her on that day.

Again, it is altogether improbable that, living away from his wife, with his circumstances becoming poorer and poorer, until after a while he was bereft of everything to meet the demands of his creditors, with no property, living in poverty, unable to labor because of his maimed condition, he should have permitted seven or eight years from the time he ceased to live with his wife until her death, to elapse without taking steps, judicially or extra-judicially, to recover so large a sum as ten thousand dollars due him for money he had loaned her!

The wife was rich, entirely able to refund the money if she owed it; he was poor and in necessitous circumstances, badly needing the amount.

And under the law of Mississippi, where the wife lived, and whose jurisdiction he himself had accepted, it would have been an easy matter to recover the alleged loan, because there the husband and wife may sue one another. Mississippi Code of 1892, Sec. 2290.

There is no explanation of this long silence.

It will not do to say that he expected her in her will to make restitution.

The relations between the couple did not justify any hope whatever on his part that she would remember him in her will. According to his statement she had forced him to leave her home, she had grown tired of him, she had no longer any use for him. The evidence discloses that she distrusted him, would not suffer him to have anything to do with her affairs, accused him of pilfering her money, of being a drunkard, of maltreating and beating her, that she was afraid of him, feared for her life, etc. And finally she severed all connection with him whatever by divorce proceedings.

Under circumstances like these he would indeed be an unreasonably sanguine man who hoped to be the beneficiary of testamentary bequests from the woman.

The money that was loaned David & Co. on September 14, 1886, was, we are satisfied, her separate funds. It was handed to them by her and the note was taken in her name. So, too, the funds deposited that day and subsequently in bank in her name (which amounts, with that loaned David & Co., went to make up the ten thousand dollars which he claims he loaned her) were her separate property, and his connection with the same, always in her presence, was that of mere service rendered in assisting her, making himself useful and accommodating to the woman he was on the eve of making his wife. At the time he claims to have loaned her the ten thousand dollars he was largely indebted to David & Co. and to other parties, was in fact insolvent, his property was mortgaged, he was in arrears for interest, etc., and it is taxing the credulity too greatly to be asked to believe that he got together and handed her, a rich woman in her own right, ten thousand dollars as an ante-nuptial loan.

We entirely agree with the conclusion of the trial judge rejecting this demand. See Bodenheimer vs. Executors of Bodenheimer, 35th La. Ann. 1005; Wood vs. Egan, 39th La. Ann. 684.

### THE COMMUNITY CLAIM.

Plaintiff's claim to one-half of the assets as shown on the inventory, based on the averment that the same belonged to the community of acquets and gains, rests on grounds no more secure than did his pretension as to the ante-nuptial loan.

And this is so whether we consider the matrimonial domicil of this couple to have been established and maintained in Louisiana or in Mississippi after the marriage. The proof is satisfactory it was established in Mississippi. Indeed Rogge substantially averred it under oath in his answer filed in the Chancery Court of Mississippi to his wife's first bill for divorce.

Nor is it necessary to pass upon the question of the validity or invalidity of the decree of divorce to determine the issue here raised.

If we consider that these parties were never divorced and that they remained man and wife, though living apart, down to her death, still plaintiff has no claim for community assets, for the very good reason that there are no community assets and never have been. Everything appearing upon the inventory is, without doubt, the separate, paraphernal property of the wife. It was all acquired

with her separate and paraphernal funds, of which she had the sole
and exclusive control and administration, and the investments stood
in her ante-nuptial name, Mrs. C. M. Amare.    The husband did not
even have knowledge of them.

While it is true that property purchased during the marriage,
whether in the name of husband or wife, is *presumed* to belong to
the community, it is a presumption which may be rebutted.    And
the rule is well established that property acquired during the com-
munity in the name of the wife may be shown to be paraphernal in
character by proof of the origin, existence and investment of para-
phernal funds administered by her separately and apart from her
husband.    Stauffer, Macready & Co. vs. Morgan, 39 La. Ann. 633;
Rouyer vs. Carrol, 47 La. Ann. 768; Miller vs. Handy, Sheriff, 33
La. Ann. 160; Succession of Lewis, 45 La. Ann. 833; C. C. 2407,
2386, 2402.

This husband, from the time of his marriage in 1886 to the death of
Mrs. Rogge in 1895, realized no profits from any source.    He owned
and cultivated for a few years after the marriage a plantation in
Iberville Parish, but the proof shows he came out in debt each year,
owed his commission merchant large balances, and the place was
lost to him by foreclosure of mortgage in May 1891.

He had separated from his wife before that, and after losing the
plantation he was more or less dependent upon others for support.
He never at any time during the marriage gave his wife a single dol-
lar, and did not contribute anything whatever towards the com-
munity, nor towards the acquisition of the property appearing upon
the inventory.

During the marriage the wife had no business, or trade, or other
means of earning money that could fall into the community, or be
invested for its account.    Her only source of revenue, from which
she supported herself and the family establishment, and from which
she derived the funds invested in the effects mentioned on the in-
ventory, was property separate and paraphernal in character, which
she owned prior to her marriage and retained the sole administra-
tion of after marriage.    She was rich in her own right, had abund-
ant resources and ready cash, for which she was constantly seeking
investment, and undoubtedly made the investments, for her own
account, in her own name and with her own funds, now figuring as
assets on the inventory.    See Ellis, Syndic, vs. Rush, 5 La. Ann. 116.

The community of acquets and gains resulting from this marriage possessed nothing, earned nothing, invested nothing.

It follows there are no community assets to be divided; no settlement of community affairs to be gone into.

### The Claim for the Marital Fourth.

Denied his claim as creditor of the wife's estate for ten thousand dollars, and denied his assertion of right to share in property alleged to belong to the community, this husband makes his last stand upon Art. 2382 of the Civil Code, which prescribes that if either the husband or the wife die rich, *leaving* the survivor in necessitous circumstances, the latter has a right to take out of the Succession of the deceased what is called the *marital portion*, which is one-fourth part of the succession property where there are no children.

But even from it must he be dislodged, for under the inexorable facts of the case his pretension can not find there, either, any sufficient breastwork of defence and protection.

The principle upon which the right of the necessitous surviving spouse to take the marital portion, the reasons, the cause, the motive of the law in granting it, is founded upon the consideration, or policy, that neither of the married persons, who have lived together in the common enjoyment of wealth and of the position which it gives, shall be suddenly reduced to want, and, accordingly, a part of the estate of the opulent deceased is appropriated to relieve the survivor, who, in the absence of it, would be reduced to poverty. Succession of Fortier, 3 La. Ann. 105; Pickens vs. Gillam, 43 La. Ann. 350.

But as to his or her right to take the marital fourth, the surviving spouse is not an heir and the portion entitled to is not an inheritance. It is, therefore, not a vested right, nor is it a debt; it is a gift, a bounty, bestowed not by the deceased but by the law, when the conditions surrounding the relations of the parties to each other before and at the time of the dissolution of the marriage by the death of one of them, and surrounding the one surviving after the dissolution, meet the requirements of the law. Thus the spouse dying must be rich, or comparatively so; the one surviving, in necessitous circumstances, or comparatively so, with regard to the other.

Again, the one dying rich—possessed of wealth which had been the common enjoyment of the conjugal pair—must *leave* the other in necessitous circumstances. If these conditions do not exist the

reason, the motive, the purpose of the law fails, and the right to take does not attach. Connor vs. Connor, 10 La. Ann. 451; Succession Justus, 44 La. Ann. 721.

For over eight years this husband and wife had not lived together prior to the death of the wife. He had resided in one State, she in another. They had no relations with each other of any kind. She had twice brought suit for divorce against him, recovering a decree the last time. For years there had been no common enjoyment of the wealth the wife possessed. She did not die *leaving* him in necessitous circumstances. Her death did not suddenly snatch him from the enjoyment of riches and reduce him to the condition of penury.

The "leaving" of this couple—the parting between them—had occurred years before the one with riches died.

The husband had gone his way—she hers—long before. He had ceased for nearly a decade to have the enjoyment of either her society or her property or means. Under these circumstances his right to claim the marital fourth cannot be held to exist. Pickens vs. Gillam, 43 La. Ann. 350.

In reaching this conclusion we recognize fully and approve of the principle announced in Gee vs. Thompson, 11 La. Ann. 657. In that case the wife was driven by the conduct of the husband to place herself under the protection of the law. She had sued for and recovered a judgment of separation from bed and board. The court held that by placing herself under the protection of the law she had not put herself in a worse condition; that the judgment of separation did not dissolve the marriage; that by it the law had, on account of the husband's bad conduct, excused her from living with him; and that being his wife when he died and legally excused from co-habitation, no fault was attachable to her and she was recognized as entitled to the marital portion.

The husband in the instant case presents no such state of facts as did the wife in that case.

Judgment affirmed.

Rehearing refused June 29, 1898.