NICHOLLS, J.
Jules J. Kunemann died intestate in New Orleans on the 28th of February, 1894, leaving a widow, but no children and a mother. His succession was not opened until the 21st of July, 1904, when, reciting the fact of his death and her relationship to him, the mother applied to be appointed administratrix thereof. No opposition having been made, she was so appointed, and received letters as such on the 7th of July of that year. •
An inventory of the property of the succession on the 1st of July, 1904, was made. The only asset figuring on that inventory was described as “a certain claim of 63 shares of a company, the exact name of which is Societe Anonyme des.Lieges des Harendas et de la Petite Kabylie,” on deposit with the Banque Commereiale et Industrielle of Paris, France, which was appraised at the sum of $5,000.
On the 4th of May, 1905, the administratrix filed a final account of administration and tableau of distribution, from which it appeared that the proceeds of sale of the 63 shares of stock, appraised at $5,000, amounted to $13,219.
The account showed, after deducting the expenses of administration, an amount of $11,710, which accountant proposed to distribute among the heirs of the deceased; and, as she was the sole and only forced heir, she was the party entitled to receive the balance shown.
The widow of the deceased opposed the account. She averred that at the time of the death of her husband he was comparatively rich, and opponent was then and still was in destitute circumstances, and by reason thereof she was entitled to the marital fourth of her husband’s estate. She averred that the sum realized in the matter of the succession had been only recently recovered and made available by and through the administration of the succession.
She subsequently filed a supplemental opposition, in which she prayed, should it be held that she was not entitled to the marital fourth, that she was at least entitled to the $1,000 accorded by law to a widow in necessitous circumstances.
The district court decreed that the opposition and supplemental opposition of the widow be dismissed at her costs, and she appealed.
The evidence disclosed that opponent was married to the deceased on the 4th of January, 1893.
Being questioned, on the trial of the opposition, as to her pecuniary condition at the time of her husband’s death, opponent said she had some property at that time, but sold it soon after his death; that after paying the mortgages upon the real estate which she *317 then had there was very little left for her. After her husband’s death she had been housekeeper for several people, and she had worked for some time as a servant at the St. Charles Hotel. At the time she was testifying , she ' was in destitute circumstances. She did not have a dollar.
At the time of her marriage she owned a house and lot on Delord street. She sqld it about three months after her husband’s death. The price of sale was, she thought, something over $3,000. At the time of her marriage she owned some furniture in a house on Burgundy street. Before her husband’s death she disposed of this furniture for something over $2,600. She owned at the time of her husband’s death some furniture in her house on Delord street. It was nicely furnished. She had at that time some jewelry. She had a watch which was valued at $500. She had several diamond earrings. Her jewelry was worth over $1,000. She used to wear this jewelry while her husband was alive, but she sold it after he died. After she sold out her property and paid her debts she had nothing left.
A witness examined on behalf of the widow testified that he had had charge of the selling of her property on Delord street; that after paying the mortgages upon it she received from the proceeds of sale about $200. The act of sale of that property was offered in evidence. It shows that the property Was sold in June, 1804, for $3,750; that at the time of that sale there were two notes due by her outstanding, which were secured by mortgage upon it — one for $1,000, with interest, and the other for $2,000, with interest. 1-Iow much interest was due upon those notes was not made to appear. One Sykes was the holder, at the time of the sale, of both of the notes. He intervened in the act of sale, canceled the same, and authorized the cancellation of the mortgages securing them. The act of sale declared that they were fully liquidated out of the proceeds of the sale.
The testimony shows that during his marriage with opponent Kunemann had a position of some kind, which he very soon lost, and from the time of losing this position he lived with his wife at her house on Delord street and was supported by her; that he had no money at that time, and no credit. One witness testified he did not have a cent. He did not have credit enough to go in a barroom and get a drink. He owed the witness $150 for money loaned to him, which he had never paid. 1-Ie had a good many boon companions, who helped him when in distress. He was buried at the expense of his widow and of a collateral relation, each paying one-half of the expenses. It would appear, however, that while this was her actual pecuniary condition in Louisiana during her marriage, and at the time of his death, he none the less, in point of fact, was entitled to the shares of stock in France, which were afterwards sold during the administration of his succession and realized the money which figured for distribution on the final account of administration. Precisely what his situation as to that stock was during his lifetime is not shown. No one, not even he himself, seems to have attached any importance to the claim. 1-Ie told one of the witnesses that his father had bequeathed the usufruct of his property to his own brother during the latter’s life, and it would appear that his brother must have died after Kunemann himself had died. No one at Kunemann’s death seems to have had any information in regard to it, and information on the subject reached the parties only years after through an advertisement giving notice of the claim and calling upon the heirs of Kunemann to make themselves known.
Turning, now, to other matters, it appears that prior to his marriage! Kunemann and t'he opponent, who was then an occupant in one of the houses of ill fame in New Orleans, held illicit relations with each other, and these terminated in a marriage between the parties. At the time of the marriage she was *318 the keeper of a house of ill fame on Burgundy street. After the marriage the wife rented a small house in the rear of the city, and to which she and her husband remote#. The husband succeeded at that time, as has been said, in obtaining employment for a short time, but he soon lost it. The parties then moved to the property on Delord street, which belonged to her and which she had up to that time rented out. She had, in the meantime, sold out the interest which she had in the Burgundy house, and opened, with Kunemann’s consent, an assignation house on the Delord street property. Kunemann died at that house while matters were in that condition. The parties during the marriage had frequent quarrels and fights, but the marital relations remained unbroken until terminated by Kunemann’s death. It is not shown that during the marriage the wife was unfaithful to him. In spite of their quarrels they appear to have been attached to each other; in fact, the husband executed what he intended to be Ms olographic will, in which he left one half of his property to his wife and the other half to his'mother. The instrument, however, had no legal force, as the date had been omitted. Wbat occurred after Kunemann’s death has already been stated. The employment which she obtained after Kunemann’s death (other than for a short time, that of a servant at the St. Charles Hotel) was that of. housekeeper in various houses of ill fame. At the time of giving her testimony she was keeping an assignation house in New Orleans.
In the brief filed on behalf of Kunemann’s mother, counsel say:
“The marital fourth * * * forms the subject of law 7, title 13, of the sixth Partidas.
“Escriche, quoting ley 26, title 13, part 5, ley 6 de Foro, says:
“ ‘If, during the time of her widowhood, the wife should live immorally, she will lose, in consequence thereof, the marital fourth.’
“Febrero, vol. 1, p. 571, also says so. This is still the law of Louisiana.
“The Supreme Court, in Saul v. His Creditors, 5 Mart. (N. S.) 607, 16 Am. Dec. 212, says : ‘We know of no question better settled in Spanish jurisprudence, and what is set.tled there cannot be considered as unsettled here. The jurisprudence of Spain came to us with her laws. We have no more power to reject the one than the other. The people of Louisiana have the same right to have their cases decided by their jurisprudence as the subjects of Spain have, except so far as the genius of our government or our positive legislation has changed it.’ ”
“ ‘Before the widow can rightfully claim the marital fourth from the succession of her husband, she must show that her husband “was’'’ rich and “left her” in necessitous circumstances. If she fails to prove either of those two essential facts, her claim will be rejected.’ Succession of Leppelman, 30 La. Ann. 468.
“ ‘It has been held that a widow, to succeed in her .claim for the marital fourth, must be in necessitous circumstances at the time of the death of her husband.’ Succession of Robertson, 28 La. Ann. 832.
“ ‘The spouse dying rich, possessed of wealth which had been the common enjoyment of the conjugal pair, must leave the other in necessitous circumstances to entitle the latter to the marital fourth.’ Succession of Rogge, 50 La. Ann. 1228, 23 South. 933.
“The rights of the widow in necessitous circumstances must be tested by the situation or condition at the date of the death of the deceased and not at the date of the settlement of the succession. Gimble v. Goode, 13 La. Ann. 352; Succession of Norton, 18 La. Annie 38; Succession of Marx, 27 La. Ann. 99; Sues cession of Le Sassier, 34 La. Ann. 1008; 'Succession of Wellmey, 34 La. Ann. 819; Succession of De Boisblanc, 32 La. Ann. 17.
“The doctrine which looks to the posterior state of things seems out of harmony with the analogies of the code and a sound legal philosophy. Connor’s Widow v. Connor’s Adm’rs & Heirs, 10 La. Ann. 451.
“The principle upon which the law appears to be founded is that neither of the married parties who have lived together in the common enjoyment of wealth and of the position which it gives should be suddenly, reduced to want; and a part of the estate of the deceased, who has died rich, is appropriated to relieve the survivor, who, in the absence of it, would be reduced to poverty. Arrowsmith v. Gordon, 3 La. Ann. 105.”
Counsel of the widow opposes, with much earnestness, the declaration made by the district judge in his reasons for judgment that:
“To grant the demand of the marital fourth ‘in hono’rem prosterite matrimonii,’ to enable the claimant widow, ‘bene et honeste vivere,’ would, under the facts disclosed, be the veriest mockery. There can be no reason in justice or. in law why the aged mother of the decease#, who is his forced heir, should be deprived'- of what has inured to his succession' for the bene *319 ,'fit of the opponent, who seems to have been the wife of deceased in nothing except in name.”
Touching that matter, counsel say:
“This would seem a remarkable assertion, in view of the fact that decedent could only ¡have married opponent because of his infatua"tion for her. However reprehensible their relations may have been, her fault was no greater '«than his. However low she may have descended in the social scale, he followed her to that level. The fact remains, so far as the record shows, that her individual life was mended from the time of her marriage. She quit her nefarious ■business, and went to live with him in a cottage, and there remained as long as he was able to support the simple establishment. There is no suggestion that «from that time until his 'death she was other to him than a faithful wife. Nor, so far as the record shows, has she ever relapsed into her former existence. And the further fact remains that until his death she eared for and supported him, and when he died from her very slender means helped to defray his funeral expenses. * * *
“To properly gauge the issues raised in this case, it must not be assumed that the deceased husband was a saint, who inadvertently married a sinner, but rather that he was a sinner himself, who, with his eyes wide open to the sin, married one like himself. There is no reason, ■legally or morally, why the same obligation should not be imposed upon such a man, in favor of such a wife, as would be imposed upon the most orthodox member of society by the most orthodox of spouses. Nor would there appear to be force in the suggestion that the aged mother of the. deceased is entitled to any ..greater consideration than the widow. The 'widow from her meager pittance defrayed half of the expenses of his funeral. The mother did nothing, a cousin defraying the other half. ■Had the mother cast off the son? Had she repudiated him? Did his death bring no forgive-ness? The record is silent as to this. Be that as it may, it must be borne in mind that the claim of the widow merely voices the claim of her dead husband; for, in his last olographic will, or what would have been a will but for the chance omission of a figure, he left her one-half of his estate. Whatever opponent may have been to the world, she was the wife of the decedent. His affection, regard, or consideration, as the case may be, is evidenced by the fact that in dying he left to her, or intended ■to leave to her, by last will and testament, ;one-half of his estate. It is submitted that she is in no manner unworthy of the protection %of the law.”
Touching the date at which the condition of the survivor should be considered with reference to a right to demand the -.marital fourth, counsel quotes from Merlin’s /Repertoire de Jurisprudence, 25, 26, p. 176, 178, as follows:
‘/Pour juger si le survivant des deux époux est dans le cas d’exiger la quarte, faut-il consideren l’Stat de sa fortune au moment précis de la mort du prédécédé? Peut-on refuser cette quarte a une femme qui, s’étant trouvée pauvre au premier instant de sa viduite, est ensuite devenue riche? Est-on, au contraire, obligé de la donner á une femme qui jouis-soit, a la meme époque, d’un bien sufficisant pour son entretien, et qui, ensuite, a tout perdu?
“Dumoulin sur le conseil 25 de Decius Barry, liv. 18, c. 4, No. 12, et Lebrun, distinguent le cas ou le changement de fortune a suivi de prés la mort du prédécédé, de celui ou il n’est survenu que long temps aprés. Si la femme qui etait pauvre au moment de la mort (dit Ijebrun) recueille une ample succession peu de jours aprés, il ne lui est point du de quarte. Si au contraire, paraisant assez bien dans ses affaires, lors meme du deeés, elle vient a étre ruinée quelque temps aprés par une incendie ou par un naufrage, elle peut demander le quarte. Que, si ces changements arrivent long-temps aprés la mort du mari, il faut laisser les choses dans l’état qu’elles sont.”
Regarding the contention made that the widow’s claim was stale and tardily presented, counsel quote from Vasseur v. Dupre, 8 La. Ann. 488, Duriaux v. Doiron, 9 Rob. 101, Succession of Newman, 27 La. Ann. 593, and Succession of Piffet, 39 La. Ann. 560, 2 South. 210, to show that until the succession of the deceased was liquidated it was impossible to ascertain whether he or she had died rich, and unless he or she had died so, and the survivor was in necessitous circumstances, the marital fourth was not due; that it was a portion allowed iu the settlement of the succession, and a right to be asserted in the court charged with the settlement of the succession; that it was in time, if it came up by way of opposition to the final account of administration. Counsel cite several eases where the claim was allowed, though not advanced until nine years after the death of the wife.
This subject, or one kindred to it, was discussed in Richard v. Lazard, 108 La. 549, 32 South. 559, where many of the authorities bearing on the subject were collated.
We are much impressed by some of the arguments advanced by counsel of the widow. Under ordinary circumstances the relations of the spouses, as between themselves, might *320 carry weight, as would also their wishes and desires. It is undoubtedly true, as stated by counsel, that in this case, however reprehensible the conduct of these parties was, viewed from and judged by the standards of virtue and morality, the widow was none the less, during her marriage, kind and considerate in many respects to her husband, and that she carried out with respect to him many of the obligations of a. dutiful wife. There is nothing showing that she was unfaithful to him while she stood related to him as his wife. It is also true that, in spite of the quarrels between them, she held his affections towards her to the last. Who was to blame in respect to the quarrels between them is not shown by the record. We cannot, however, overlook the fact that the source of the right to the marital fourth is derived from the law itself, and that the will of the lawmaker as to the terms and conditions under which it should be exercised is to be looked for and ascertained by the courts, and not the will of the spouses themselves. The courts are bound to confine the exercise of the right to the class of cases proper for the execution of the purposes which the lawmaker had in view.
The claim of the widow in this ease is advanced under very peculiar circumstances.. Neither of the spouses could be said to have had the advantages of wealth or riches during the marriage. Whatever rights or claims the husband may have had at that time to property, they were very remote, and exercised no influence whatever upon the existing condition or mode of life of the spouses. The husband during the marriage was practically and substantially penniless, a pauper, dependent upon and receiving his support from his wife. As between the two at that time, the wife was the better off pecuniarily. So far from any means left by the husband at his death enabling her to continue for a period at least in a position of comparative affluence, or the fact of his death changing her condition suddenly for the worse or reducing her to poverty or want (which this court has several times declared was the purpose and object of the law to avoid), that fact really bettered her-eondition and relieved her from pecuniary burdens up to that time existing. Neither she nor any one else in Louisiana had knowledge of or could locate any claim to property which was held by him or which she could utilize.
Information of the claim held by him only came to light years after his death. During all that time the situation of affairs existing at his death had continued unchanged and had become fixed. To recognize the widow’s claim now would not have the effect of continuing her in a condition of comparative affluence in which she had been left, but of placing her in a new position and one she had at no time possessed.
The claim of the widow under the statutes of the state to $1,000 as a widow in necessitous circumstances is not pressed by counsel.
Conceding that she might have been entitled to that amount, there is no basis furnished us by the record by means of which the amount she could demand could be fixed. She certainly had some means when her husband died. Exactly how much we do not know.
For the reasons herein assigned, the judgment appealed from is affirmed.