MONROE, J.
Jacques Pelloat, an unmarried man, of the peasant class, came to this country from the south of France in 1866, and settled in the parish of St. Tammany, where he engaged in business and prospered, and where he was'joined some time later, by his brother, Peter, and his sister, Mrs. Peyre; • another sister, Mrs. Christia-Blanchine, remaining at home. Mrs. Peyre appears to have kept house for him, and, many years ago, he formed the acquaintance of Lillie Gaile, then a girl, who grew up, married, became a widow, and lived in New Orleans, where she worked for her living, earning from $6 to $8 a week, boarding with her sister, in a house where her mother also lived, and paying $12 a month for her board and lodging. The acquaintance between her and Pelloat appears to have ripened into a warmer feeling, and in the summer of 1909 they decided to be married; but he impressed it upon her that the marriage should be kept secret, giving her to understand that he was afraid of his relatives, and, rather indefinitely, that it was necessary on account of his business. He engaged the services of a priest *876 and told him that he wanted the marriage kept absolutely secret; that he wanted the publication of the bans dispensed with; that he intended to go to France to see about the placing of some money that he had sent there; and that, when he came back, he would make the marriage public. He also told him, referring to his relatives here, that he had been neglected, and that they all wanted his money. The result was that the priest, who had known him for some years, attended to the obtaining of the marriage license; also obtained permission, from the church authorities, to dispense with the bans; arranged to have the ceremony performed in a (church) parish other than that in which either of the parties resided; and on October 7, 1909, at about 8 o’clock in the evening, the marriage was celebrated, according to law and to the canons of the Roman Catholic Church, in St. Anthony’s Church, on North Rampart street; and the groom paid the reverend father $3 for his services, paying also a fee of $10 to the priest within whose jurisdiction the marriage, under the rules of the church, should have been celebrated. After the marriage the couple repaired to the house where the bride had been boarding, and remained there all night, apparently, in adjoining rooms, but, really, in the same room; the fact of his remaining exciting no comment, for the reason that he had lodged there before on his visits to the city. The next morning he returned to Covington, leaving his wife where she was, under the name that she had been bearing, and, so far as the inmates of the house knew, unmarried. Thereafter he visited her three or four times a month, and they corresponded with each other. He furnished her with money with which to pay her board and buy her clothing, and she stopped working. They discussed the question of the building of a residence in the city and selected a site, and he spoke of beginning the work, and, also, of giving her $10,000 worth of jewelry on the anniversary of his birthday, which was to have come in April. They also talked of the trip to France. They called upon the priest who had celebrated the marriage, and, the wife requiring some medical attention, they called, together, on a physician, to whom Pelloat introduced her as his wife, and whose services he engaged in her behalf. Pelloat also seems to have mentioned the marriage, with an injunction of secrecy, to a negro whom he had known for many years, and whose wife did some dress making for Mrs. Pelloat. Otherwise, the secret was pretty well kept, though a slight suspicion appears to have been aroused, even from the beginning, since, on the day after the marriage, Peter Pelloat’s married daughter, living in New Orleans, wrote to her cousin, the daughter of Mrs. Peyre, at Covington, that she had heard that her uncle and Lillie Gaile were going to be married. The letter was addressed in her uncle’s care, and he appears to have taken possession of it, as it never reached the person to whom it was addressed until after his death, when it was found in the pocket of his coat. Early •in March, 1910, Pelloat was taken sick, in Covington, and though, for a week or ten days, the matter was not considered serious, at the end of about two weeks, he died. His wife did not know of it until after his death; but, 'as soon as she was informed of his death, she announced the marriage, and on the next morning went to Covington and made further announcement upon the subject among his relatives. He died, intestate, leaving an estate valued at more than $150,-000, and leaving his wife about $500, being the balance left of the money, less, probably, than $1,000, with which he had furnished her during his life. The succession was opened by Peter Pelloat, and there was some skirmishing in the court concerning 'the appointment of an administrator and other *878 matters; but, finally, the conflict was narrowed down to a claim by the brother and sisters, on the one hand, to be put in possession of the estate of the decedent, as his sole heirs, and a claim by the widow, on the other hand, to be allowed to take from the estate the marital portion — that is to say, “the fourth of the succession in full property.” The heirs, in their pleadings, deny that plaintiff (as we shall, for convenience, call the widow) was married to decedent, or that she is in necessitous circumstances, and then, in general terms, deny that she is entitled to the marital fourth. But as the marriage, the necessitous circumstance, of the widow, and the wealth of the decedent are established beyond any question, the general denial that she is entitled to the marital fourth has been explained in the argument to mean that the marriage was not- of the kind to which the law relating to the marital fourth is intended to apply; the contention being that the marital fourth is intended to keep one of the spouses who has been accustomed, during the marriage, to the enjoyment of wealth, from being suddenly reduced to penury, and that it is not intended-for a wife who has been accustomed to nothing but penury, or who has not lived constantly with her husband, and borne his name, and shared his fate, or for a wife who has been wanting in interest, feeling, or attachment for her husband.
The law applicable to the facts of the ease is found in the following provision of the Civil 'Code, to wit:
“Art. 2382. When the wife has not brought any dowry, or. when what she has brought as a dowry is inconsiderable with respect to the condition of the husband, if either the husband or the wife die rich, leaving the wife in necessitous circumstances, the latter has the right to take out of the succession of the deceased what is called the marital fourth; that is, the fourth of the succession if there be no children. * * *»
And the ease presented by the plaintiff before the court meets all tbe conditions required, since she was the wife of the decedent, and brought no dowry, and the decedent died, rich and childless, leaving her in necessitous circumstances.
The theory of the defense is predicated upon expressions, 'found here and there, in opinions dealing with particular cases and the application of which should be, as they were intended to be, confined to the cases in which they were used.
Thus: Counsel for the heirs quotes from the opinion in Succession of Fortier, 3 La. Ann. 105, to the effect that:
“The principle upon which the law appears to be founded is that neither of the married parties who have lived together, in the common enjoyment of wealth and of the position which it gives, shall be, suddenly, reduced to want; and a part of the estate of the deceased, who had died rich, is appropriated to relieve the survivor, who, in the absence of it, would be reduced to poverty.”
And from that they reason that the sole purpose of the law is to keep one who has become accustomed to wealth from being suddenly reduced to poverty, and that it has no application where the survivor, left, absolutely destitute, had not become accustomed to wealth during the marriage, whether because the marriage had been too recent, or because the deceased was too niggardly, or for any other reason. The language quoted was, however, used in a case where the wife died leaving $26,000, and a surviving husband, who was 26 years old, and healthy, and who had two slaves worth $1,100, but no profession or calling, and the purpose was merely to show that he was in necessitous circumstances, notwithstanding that he had property of the value of $1,100; such property being inadequate to his support. The court further said:
“The object of the law is to provide a support out of the property of the deceased, without reference to the ability of the survivor to support himself by his industry or personal exertions alone. The only question that can arise is as to the sufficiency of the pecuniary means of the husband for his support. The evidence *880 shows that they are inadequate, and this fact, in our opinion, entitles him to the one-fourth part of the succession of his wife, who died, comparatively rich, and without issue.”
Counsel refer to a citation, in the opinion in Pickens v. G-illam et al., 43 La. Ann. 350, 8 South. 928, from Merlin, to the effect that the 58th and 117th novels of Justinian required two conditions; besides the poverty of the surviving wife, in order to entitle her to the marital fourth: “The first, an honest marriage; second, that she always abided with him.” And they reason, therefrom, that because plaintiff did not live constantly in the same house with her husband, she is not entitled to recover. The opinion referred to was, however, handed down in a case in which it appeared that the parties had married in 1871; had separated within two years after the marriage. That the wife “had been driven away; had been made an outcast; her name had been mercilessly aspersed by her husband; she attempted to return, but was prevented by him.” That she obtained a separation from bed and hoard, and “during seventeen years there existed a cold resentment between them, and not the least attempt at reconciliation. They were strangers to each other, and it was as though they had not been married.” And that, at the end of the 17 years, the wife died leaving $8,000, from which the husband claimed the marital fourth. It was held that he was not left by the death of the wife in necessitous circumstances, but that the leave taking dated long prior to her death, and that he was re- ■ sponsible for it, and hence that he could not recover.
In the case at bar, the wife, from the time of the marriage, which was “an honest marriage,” resided in the only home that the husband provided for her, and, at a sacrifice than which no greater could have been asked of a woman, respected his wish that the marriage should be kept secret. The opinion referred to, therefore, has no sort of application to the facts now under consideration, and the most that is said of the novels of Justinian and the comment of Merlin is that:
“The principle which prevailed in construing the laws just quoted is felt in the jurisprudence of Louisiana.”
That is to say, it was felt to the extent that it was thought possible to apply it in the very extreme case which the court was called on, then, to decide, and which bears no resemblance to the case at bar. Counsel refer to the opinion in Succession of Rogge, 50 La. Ann. 1228, 23 South. 933, as supporting the contention that, in order to entitle the surviving wife to the marital portion, she must be, suddenly, reduced to a condition of poverty, to which she was unaccustomed. The opinion cited gives the substance of the language of the court in Succession pf For-tier, to which we have already referred; but the judgment is based upon the fact that the spouses had been separated for eight years, prior to the death of the wife, she living in one state, and he in another, and that she had, twice, sued for divorce, obtaining a decree in the second suit. “The ‘leaving’ of this couple,” said the court, "the parting between them, had occurred before the one with the riches died.”
Counsel also refer to Succession of Kunemann, 115 La. 604, 39 South. 702, the inapplicability of which, for the purposes of the question here presented, becomes apparent upon the mere statement of the case, which was as follows:
When the husband died he was without means or occupation and was supported by his wife. About 10 years later, it was discovered that he was the naked owner of certain property in France of which another person enjoyed the usufruct, and that, the usufructuary having died, the title and use of the property were united in his succession. The litigation which arose was between the mother of the decedent, as his *882 forced heir, and the widow, claiming the marital fourth. The court ruled that the husband could not be held to have died rich, as the wife, at the time of his death, was the better off of the two. It is true that the organ of the court, in the course of the opinion, said:
“To recognise the widow’s claim, now, would not have the effect of continuing her in a condition of comparative affluence in which she had been left, but of placing her in a new position and one she had, at no time, possessed.”
From which the argument is deduced that, in order to entitle the surviving spouse to the marital fourth, she, or he, must have been actually enjoying the wealth of the other at the moment of the latter’s death. We do not think that the language quoted was intended to be so construed. It was used with reference, and for application, to the case under consideration, in which the court found that the husband had died 10 years before, and had not' died rich. Fearing some such misconstruction, however, Provosty and Monroe, JJ., “concurred, on the ground that the husband did not die rich.” The argument mentioned would lead to the conclusion that a law which gives to the surviving wife, in necessitous circumstances, one-fourth of the estate of her deceased, and childless husband, who dies rich, means that, unless the husband has been liberal, during his life, and has shared his wealth with his wife, she can take none of it, after his death, no matter what her necessities may be — a construction which we are not willing to adopt.
It would be a work of supererogation to review the decisions which, as we think, sustain that construction of the law in question which entitles plaintiff to recover. We, however, note some of them which have been called to our attention, as follows, to wit: Melancon’s Widow v. His Executors, 6 La. 105; Foster v. Ferguson, Tutor, 1 La. Ann. 262; Succession of Fortier, 3 La. Ann. 104; Dunbar v. Heirs of Dunbar, 5 La. Ann. 158; Connor v. Connor, 10 La. Ann. 440; Gee v. Thompson, 11 La. Ann. 657; Succ. of Doucet, 13 La. Ann. 613; Succession of Piffet, 39 La. Ann. 556, 2 South. 210; Smith v. Smith, 43 La. Ann. 1140, 10 South. 248; Dupuy v. Dupuy, Adm’r, 52 La. Ann. 869, 27 South. 287.
There was judgment in the district court in favor of the plaintiff, decreeing her entitled to take out of the succession one-fourth part thereof, in full property; and, from the judgment so rendered, Peter Pelloat appealed and brought up the transcript No. 18,478. Thereafter Mrs. Christia-Blanchine’ and Mrs. Peyre, likewise, appealed, and brought up the transcript No. 18,547. The different appeals, having been taken from the same judgment, and presenting the same question, have been consolidated and treated as one, and the judgment now to be rendered is intended to dispose of them all.
We find the judgment appealed from to be correct, and it is, accordingly:
Affirmed.