COX et al. v. DE SOTO CRUDE OIL PURCHASING CORPORATION et al.

Civ. A. No. 293.

District Court, W. D. Louisiana,
Shreveport Division.

May 24, 1944.

Harry V. Booth (of Booth & Lockard), of Shreveport, and C. H. Machen (of Machen, Chancellor & Wood), of Dallas, Tex., for plaintiffs.

Hussey & Smith, of Shreveport, La., for defendants.

Melvin P. Johnson, of Shreveport, La., for B. P. Crittenden.

PORTERIE, District Judge.

This suit is a sequel to Civil Action No. 2805, styled Sweatt v. Oil Refineries, Inc., D.C., 29 F.Supp. 992, decided by jury on the 19th day of July, 1939, wherein a motion for new trial was overruled by the court, pleas, special defenses of prescription, etc., were overruled, and judgment rendered in favor of plaintiff receiver and against various defendants in solido, including M. J. Grogan and B. P. Crittenden in the sum of $90,000.

The issues in Civil Action No. 2805 were almost identical to the issues here, particularly as to the scheme and design to defraud; the parties defendant included all the parties here and others. It was the information that the defendants were compelled to disclose in this action that

brought to light the facts upon which the present suit was based.

Plaintiffs, Box et al., allege that M. J. Grogan and B. P. Crittenden, residents of Shreveport, Caddo Parish, Louisiana, incorporated the Apex Pipeline Company, Inc., Centera, Inc., and the De Soto Crude Oil Purchasing Corporation, a Delaware corporation, as well as De Soto Crude Oil Purchasing Corporation of Louisiana, successors to the Delaware corporation, and became officers, stockholders and directors of each of the named companies; that these individuals dominated said corporations, directed their policies, and for all practical purposes, said corporations were the vehicles through and by which these two individuals carried out a plan and scheme to violate the proration regulations issued by the Texas Railroad Commission and at the same time defraud plaintiffs of their proportionate share (.0824228) of the royalty interest in the oil produced from the lease described in paragraph 13 of plaintiffs' petition.

Paragraph 16 of plaintiffs' petition alleges facts which constitute the structure of this case: "Plaintiffs would further show and allege that sometime prior to the month of June, 1933, the exact date which is unknown to plaintiffs but well known to defendants, that the defendants and W. M. Sullivan and Lynn Burch, or their agents and employees entered into an agreement and conspiracy to produce and transport oil from the above described property illegally and in excess of the allowable set by the Railroad Commission of Texas, and to convert plaintiffs' proportionate share of such illegal oil, and to fraudulently conceal from plaintiffs the production, transportation and purchase of said oil; the purpose and intent of such fraudulent concealment being to convert plaintiffs' proportionate share of said oil to their own use and benefit, and to avoid payment to plaintiffs for said oil."

Paragraph 17 gives the number of barrels of illegal excess oil that was purchased and transported from plaintiffs' property during the period of the alleged fraudulent scheme and conspiracy, as follows:

"In June, 1933 ........ 4,416.74 Barrels
In July, 1933 ......... 7,731.39 Barrels
In October, 1933 ...... 4,048.48 Barrels
In December, 1933 .... 6,960.40 Barrels
In January, 1934 ..... 21,520.42 Barrels
In February, 1934 .... 12,694.76 Barrels
In March, 1934 ....... 20,525.07 Barrels

being a total of seventy-seven thousand, eight hundred ninety-two and 26/100 (77,-892.26) barrels of oil produced and transported from said tract of land in excess of the allowable set by the Railroad Commission of Texas."

Defendants answered after setting forth seven special defenses, admitting the incorporation of the various Grogan-Crittenden companies; admitting that Grogan and Crittenden were officers and directors of said corporations; admitting that the De Soto Crude Oil Purchasing Corporation, Centera, Inc., and Apex Pipeline Company, Inc., purchased crude oil from wells located on the said property owned by plaintiffs during the years 1933 and 1934 and then alleged: "Defendants show that all of said oil was purchased from the owner of the oil, gas and mining lease covering, affecting and applying to said property, and that for all oil received by them from said property, said defendants paid the prevailing price to the owner of the oil, gas and mining leases affecting said property, and obtained acquittance therefor."

They further admit that the Apex Pipeline Company purchased from the property in question 64,382.10 barrels of crude oil and that Centera, Inc., purchased 1,366.1 barrels and that payment was made as set forth in Paragraph 12; it is especially denied that any of the facts and circumstances as depicted in plaintiffs' petition were withheld or concealed from plaintiff, and it is further alleged "that for oil purchased from said land, payment was duly made to the mineral lease owner and operator, to the knowledge of plaintiffs and their agents, more than one year prior to the institution of this suit." (Paragraph 23.)

The Apex Pipeline Company, Incorporated, and Centera, Incorporated, were in the process of liquidation at the time that this suit was filed. Subsequently to the filing of the suit, the De Soto Crude Oil Purchasing Company of Louisiana, successor to De Soto Crude Oil Purchasing Corporation of Delaware, went into bankruptcy. A settlement and compromise was made between the present plaintiff and Mr. M. J. Grogan. During the trial of this case, plaintiffs dismissed their demands as of voluntary nonsuit against all the defendants except B. F Crittenden.

The defendant, consequently, claims that this suit represents a stale demand. He shows that it was filed in 1940 for the torts,

described above, that occurred in 1933 and 1934. The claim remained in court undecided from May, 1940, to March, 1944, answer having been filed June 12, 1940. The oral testimony adduced on the day of trial referred to transactions already ten years old. During the period that the suit was in court, three corporations had been liquidated and dissolved, and another corporate party had gone into bankruptcy. During the same period the person operating the oil lease for the plaintiff and receiving ⅞ of all production, and accused as one of the leading conspirators, Mr. Sullivan, died. One Carl Kennedy, plaintiff's agent and gauger, living on the oil property, died, and so did Mr. C. H. Machen, attorney from Texas, legal representative, investigator, and original counsel for plaintiffs. This late marshaling of a stale demand against many grew into a belated demand against B. P. Crittenden alone. Summarizing, the defendant stresses that the suit is too late, or so stale and weak that it cannot be brought to that legal certainty which is required by law as a burden of the suing plaintiff.

There are two principal legal defenses in this suit, to-wit: lack of liability of Crittenden as an individual for corporate acts and the application of prescription.

■ The first and important questions of fact to decide before the application of legal principles arises are (a) whether or not there is proof of an actual scheme and design to defraud and whether or not Crittenden participated in it, and (b) whether or not that proof is of sufficient legal certainty, as required by Louisiana law to prove fraudulent acts, bearing in mind, through it all, that the burden of proof is upon the plaintiff.

After listening to the testimony, both on direct and cross-examination, of Mr. Marshall, the main and leading witness for the plaintiffs, and after examining the exhibits of plaintiffs, notably P-1 through P-10, then P-11, and then particularly P-12 (those latter two being the records of pipeline runs originally filed in the Big Indian Refineries case), we are so satisfactorily impressed with the truthfulness of Mr. Marshall's testimony as to say conscientiously that it gives proof of plaintiffs' case, not only by the preponderance of evidence (which degree of proof would perhaps be insufficient in a case of this character), but beyond a reasonable doubt.

There was no personal interest in Marshall inducing him to make these avowals including himself in wrongdoing. He was continuing to tell the truth as he had told it in the Indian Refineries case.

■ The defendant attacks the credibility of Marshall as a witness because the plaintiff first sought to place Marshall under cross-examination supposedly authorized by Rule 43 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Marshall was the employee of Crittenden. But upon an adverse ruling from the court, the plaintiff became compelled to make Marshall his own witness. Further, since Marshall is one who had conspired in the Refineries case, and with profit for himself and for Crittenden, personally and individually, and had turned into a Government witness, his testimony in the instant case should be accepted only cautiously.

These contentions are sound and the court was particularly circumspect and cautious in the consideration of Marshall's testimony.

■ A stale demand long withheld from presentation or prosecution until he against whom it is preferred, has died, is regarded with disfavor. It must be established, when no hindrance is in the way, with more than reasonable certainty.

■ The unfavorable presumption created by the delay can be removed only by peculiarly strong and exceptionally conclusive testimony. Many cases were furnished us in brief in support of the principle. Among the number we have thought the following to be the most apposite: Wood v. Egan, 39 La. Ann. 684, 2 So. 191; Downey v. Succession of Henderson, 41 La. Ann. 489, 6 So. 811; Succession of Rogge, 50 La. Ann. 1220, 1226, 23 So. 933; Kuhn v. Bercher, 114 La. 602, 608, 38 So. 468.

■ We did apply the strict degree of certainty required in a case where fraud is alleged, and we did believe in what Marshall said, to that degree required to convict when one is charged with the commission of a crime—that is, beyond a reasonable doubt. But that degree of certainty was reached by the court, not solely upon the words of Marshall, but upon the documents—the physical evidence—filed with the court. These documents were prepared by others and not by Marshall. We did not rely upon circumstantial evidence to reach

that degree of conviction. We accepted Marshall's testimony and the supporting documents connected therewith under the exacting requirements established by the cases of Calhoun v. McKnight, 44 La.Ann. 575, 10 So. 783; Belcher v. Booth, 164 La. 514, 114 So. 116; Metcalf v. Monsour, 195 La. 570, 197 So. 235; and Garnier v. Ætna Ins. Co., 181 La. 426, 432, 159 So. 705.

The record in this case is not one inferential and secondary in character and drawn wholly from the Big Indian Refineries suit. Original documents filed legally and properly in the Big Indian Refineries case were borrowed from that record and became proper and legal evidence in the instant case. The actual original documents are in the present record.

This finally and definitely disposes of the merits of the case; but granting that the plaintiff be entitled to a judgment, the defendant has filed the plea of prescription of one year, because the plaintiffs' suit is based on a tort. Louisiana Civil Code, Article 3536.

The prescription begins to run "from the date knowledge of such damage is received by the owner thereof." La.C.C. Art. 3537.

The burden is on the plaintiff to show when he received knowledge of the trespass, or that knowledge of the conversion of the oil was first acquired within a year from the date of suit. Urania Lbr. Co., Ltd., v. Powers & Critchett Lbr. Co., La.App., 166 So. 190; Liles v. Barnhart, 152 La. 419, 93 So. 490; Spyker v. International Paper Co., 173 La. 580, 138 So. 109.

It has been held that a notice of facts which should excite inquiry and which, if pursued, lead to knowledge of other facts, operates as notice. Poirier et al. v. Burton-Swartz Cypress Co., 127 La. 936, 54 So. 292; National Park Bank v. Concordia Land & Timber Co., 159 La. 86, 105 So. 234. Cf. Mayer v. Ford, La.App., 12 So.2d 618; 8 Words and Phrases, Perm. Ed., Constructive Knowledge, p. 827; Id., Constructive Notice, p. 828; 28 Words and Phrases, Perm.Ed., Notice, p. 816; 33 Words and Phrases, Perm.Ed., Principal and Agent, p. 607. See also 2 Am.Jur. (Sec. 368) 286.

The defendant strongly urges that Machen, Kennedy and Cox knew about the conversion of oil more than a year before the institution of suit—if not directly of the conversion of oil, then of other facts which should have put them on inquiry.

Marshall did not testify that the Coxes knew or should have known that excess oil was being taken from the land. Marshall was not an employee of the Coxes.

The older Cox testified that he did not live on the farm at the time that the oil was produced. He said that he employed Kennedy as a royalty gauger to check the run of oil. Kennedy not only worked for him, but also for others by whom he was employed at the same time and for the same purpose. Kennedy had quite a number of wells to gauge, and of necessity could not remain permanently at any single one well. From the evidence, we should think that a royalty gauger is a watchdog, but he is far from being an absolute protection against operators of wells and pipeline gaugers who desire to run hot oil. The Coxes as plaintiffs are not to be burdened with the responsibility of the knowing of the theft of oil by keeping constant guard over their wells twenty-four hours daily.

The fact, though, is that oil was stolen from the wells on the Cox leasehold, and for which plaintiff Cox was never paid. Undoubtedly, some of the oil was despoiled when Kennedy was supposed to be on the watch. There is no proof in the record of any connivance by Kennedy, however.

It is noteworthy from the evidence that as soon as young Cox began to gauge the wells on the Cox farm, the defendants desisted from the production of excess oil off the Cox farm. The documentary evidence showing the runs with dates supports this fact. The evidence of young Cox was that he did not know that hot oil would be run at night, but he did say that occasionally he checked the lease at night-time.

All pipeline gaugers use seals whenever a tank is emptied into a line, but never when hot oil it run through the tank into the line. There is no evidence in the case that as far as the Cox leasehold was concerned that there was any agreement to produce hot oil by all the parties concerned.

There is no proof that Machen, the attorney for Cox, knew of any conversion of his clients' oil until the summer of 1939. The fact that Mr. Cox on the witness stand

admitted collecting large sums of money from other operators for oil did not prove that he had collected money for excess oil in this case. The money he collected was subsequent to the year 1939, and was only as a result of claims filed in the courts.

The court very early in the case before Mr. Cox and his son had testified, after being satisfied with the absolute proof that hot oil had been run, stated from the bench that what the Court needed was proof that Cox had not been paid already. The court stated that perhaps Cox was after payment for a second time. The court stated at the conclusion of the trial in open court, and will now make the same statement in writing, that it was fully satisfied after having heard Mr. Cox and his son testify, that they had not participated in the steal.

Also during the course of the trial, we said: "Why did not the Coxes sue Sullivan?"

We understand now that the landowner, the lease operator, and the pipeline owner form a three-cornered relationship and that the landowner, as a rule, is in contact with the pipeline owner, but not with the operator of the well. Messrs. Sullivan and Burch, the operators, did not know Cox. Mr. Cox looked to the pipeline company for payment for his share of any and all oil removed from the property.

The evidence discloses that the plaintiffs received knowledge of the conversion of their oil on the 21st day of July, 1939. In the Big Indian Refineries case held at that time the defendants offered documentary evidence to show from whom they bought over one million barrels of excess oil. Included in this quantity was the oil in this particular case.

When the plaintiffs in the Big Indian case produced Cox and his lawyer, Machen, to disprove the defendants' allegations, the defendants then admitted in open court that Cox had not been paid. That fixed the date of discovery by Cox and his lawyer. Cox and his lawyer Machen then made an investigation and upon its completion, Cox's lawyer, Machen, then filed suit, and made demand for payment from the pipeline. Marshall disclosed that he worked under and by the instructions of Crittenden, who had charge of the field operations. He also said that he was furnished the cash to buy the hot oil, and he kept the record in the field in regard to such purchases. He went further and admitted that the pipe line company got the oil and had not paid Cox for it, although the pipeline did pay the Coxes by check for all legal oil produced from the leasehold.

Mr. Cox testified that he first had knowledge sometime in February, 1940, and that was after he had moved his domicile from Winnsboro, Texas, to the state of Arkansas, in which state he was living at the time of the trial. His removal from one state to the other definitely fixed the date of his mind. His lawyer, Machen, learned about the conversion of the oil on the day before the jury brought in a verdict in the matter of the receiver in the Big Indian Refineries case. That day was the 21st day of July, 1939. This suit was filed on May 21, 1940. Nothing was offered in rebuttal of these witnesses.

The plea of prescription cannot be sustained.

We adopt the finding of facts as prepared by counsel for plaintiffs, to-wit:

"(a) That the De Soto Crude Oil Purchasing Corp., both of Louisiana and Delaware, the Apex Pipeline Company, Inc., and Centera, Inc. were organized by B. P. Crittenden and M. J. Grogan, sometime prior to June 1, 1933, for the purpose of buying and transporting, as common carriers, crude oil from the East Texas oil fields and that the policy of all these companies was controlled and dominated by these two individuals;

"(b) That the Apex Pipeline Company and De Soto Crude Oil Purchasing Corporation purchased and transported the allowable oil from plaintiff's premises from June 1, 1933, to March of 1934, and accounted for same by rendering monthly run statements for all such oil purchased and transported from the Sullivan-Burch lease;

"(c) That both of these companies recognized, throughout this period plaintiffs' fractional mineral interest in the so-called Sullivan-Burch lease and as above stated, truly accounted for all allowable oil purchased and transported;

"(d) That beginning in June, 1933, the Apex Pipeline Company transported from the Sullivan-Burch lease 4,416.74 barrels; in July, 1933, 7,731.39 barrels; in October, 1933, two purchases, one of 1,126.01 barrels and the other, 2,922.47 barrels, or a total for the month of 4,048.48 barrels; in December, 1933, 6,960.40 barrels; in January, 1934, 3 purchases, one of 11,745.48, 1 of

5,162.08 and 1 of 4,612.86, or total purchases of 21,520.42; in February, 1934, three purchases, the first being 1,240.36 barrels; the second 5,557.40 barrels and the third being 4,566.39 barrels, or a total of 12,694.76; in the month of March, 1934, carried on the books of Centera, Inc. (see P-11) two purchases were made, one 19,-158.21 from the Sullivan-Burch lease and the other from Wainwright-West, successor to Sullivan-Burch, of 1,366.86, making a total of 20,525.07 barrels, or a grand total of 77,892.26 barrels of oil produced and transported from the Sullivan-Burch lease in excess of the allowable set by the Railroad Commission of the State of Texas, and for which no accounting was rendered plaintiffs as to their recognized fractional interest.

"(e) That the above oil was illegally taken from plaintiffs' land through a scheme and conspiracy on the part of Crittenden and Grogan in a plan to avoid proration regulatory measures established by the Texas Railroad Commission for the production of oil in East Texas, both Crittenden and Grogan knowing at the time that in doing so they were defrauding the plaintiffs out of their proportionate share in the proceeds or value of the oil so taken.

"(f) That the plaintiffs had no knowledge of the conversion of their oil by the defendants until they were advised by their attorney, C. H. Machen, on the 21st day of July, 1939 through admissions made by defendants in the case of 'Sweatt v. Oil Refineries, Inc.,' No. 2805 on the docket of this court.

"(g) Plaintiffs were not in possession of any facts prior to the disclosures made in the Big Indian suit which could have placed them on inquiry that their oil was being illegally taken; their employment of a gauger in an attempt to check on oil that was produced and transported from the Sullivan-Burch lease evidences more than ordinary diligence on their part.

"(h) That the defendants covered their operations in the purchase and transportation of excess oil from the Sullivan-Burch lease by such stealth and other devices of concealment making the apprehension of their wrongdoing extremely difficult."

 Our conclusions of law are also borrowed from the brief of plaintiffs' counsel:

"(a) That an officer, agent, manager or employee of a corporation, who knowing-ly, participates, aids, or abets such corporation in the commission of a tort is solidarily liable with such legal entity for all damage or loss sustained by a third person. (Revised Civil Code, Article 2324).

"(b) That the period of prescription, provided for in Articles 3536 and 3537 of the Revised Civil Code of Louisiana does not begin to run against a plaintiff until he knows or in the exercise of ordinary care could have known not only of the conversion of his property, but the name of those guilty of such conversion."

Judgment will be signed upon presentation in the favor of plaintiffs and against B. P. Crittenden for the market price of oil taken from their leasehold, as follows, to-wit: Plaintiffs' fractional mineral interest of a .0824228 of 77,892.26 barrels or 6,420.51 barrels at $1.00 per barrel (less gross production tax) or the sum of $6,-292.10, with 5% interest on said sum from April 1, 1944 until paid.